# GANS SALVAGE COMPANY *vs.* ROBERT BYRNES.

*Master and Servant—Injury to Employee From Fall of a Wall of a Burned Building—Insufficient Evidence of Negligence—Assumption of Risks by an Employee—Concession of Prayer.*

In an action by an employee to recover from the employer damages for an injury caused by the fall of a wall of a burned building, while at work in the cellar, on the ground of defendant's negligence in putting him to work in a dangerous place, the plaintiff must prove that the wall which fell was in a dangerous condition when he was placed in proximity to it; that the defendant had knowledge of this dangerous condition before the injury, and that he, the plaintiff, was ignorant of the danger and by the use of proper care could not have discovered it before the wall fell.

The fact that the wall of a building destroyed by fire falls a month afterwards is not in itself evidence to prove that the wall was then in a dangerous condition, in a case where there is nothing to show why it fell.

The rule that an employee who contracts to do hazardous work assumes the risk of injury from obvious dangers, of which he knows, applies to the case of a workman employed to remove goods from the cellar of a building destroyed by fire who is injured by the fall of a wall which the employer had no better reason than he to think was dangerous.

A conceded prayer whether right or wrong becomes the law of the particular case.

After the destruction of a building by fire there were left standing some of the walls and a brick vault, about five feet square, extending from the cellar to a height of about thirty-five feet, which presented the appearance of a square stack or chimney with iron doors opening into it at each floor. The cellar was divided into arched compartments where canned goods had been stored. A month after the fire the defendant company was engaged in getting out these goods, by digging through the doors of the compartments, and plaintiff was employed as a laborer in this work, under a foreman of the defendant. A subordinate of the city building inspector, without making an examination of the premises and without designating any particular wall as dangerous, notified the foreman to take care of the walls if work was contined there. One of the walls was thereupon thrown down, but the vault stack was allowed to remain, and it seemed to be solid and secure. Afterwards, while the business of removing the debris from the cellar was in progress, the upper half of the vault stack toppled over and injured the plaintiff. In an action to recover damages for the injury, un-

der a declaration alleging that the defendant put the plaintiff to work in a place known to be dangerous by the defendant and unknown so to be by the plaintiff, *held*, that the mere falling of the wall was not in itself evidence of the defendant's negligence; that there is no evidence to show that the walls were in fact in a dangerous condition before the accident happened, or that the defendant had any reason to believe that they were unsafe, since they formed a square compact column, which had stood firmly for a month after the fire seemingly unaffected by it, and therefore there is no evidence that defendant put plaintiff to work in a place which he knew, or ought to have known, to be dangerous.

*Held*, further, that the opinion of a witness that if the debris were removed the walls would fall, is only a speculation, because there is nothing to show either that the debris had been removed, or if removed to what extent it had been taken away, or what casual relation, if any, existed between its removal and the collapse of the wall.

*Held*, further, that if it be assumed that there was evidence legally sufficient to show that the walls were in an unsafe condition when the plaintiff was put to work in the cellar, then, in the absence of any proof as to what caused them to fall, the means of knowing the danger incident to the work were as apparent to the plaintiff as to the defendant, and the plaintiff, being employed in a hazardous occupation, assumed the risk of injury from the possible collapse of a wall left standing after a great fire, when he must be presumed to have known that a gale of wind, or a vibration produced by the dynamiting of other walls in neighboring parts of the burned district, or a jar resulting from the fall of other walls in the vicinity, or the absorption of rain by the exposed mortar, might cause the wall in question to totter and fall.

Appeal from the Court of Common Pleas (SHARP, J.), where there was a judgment for the plaintiff for $1,500.

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*Carroll T. Bond* and *George Weems Williams* (with whom was *William L. Rawls* on the brief), for the appellant.

The fall of the wall has by itself no probative effect. By the plaintiff's conceding defendant's fifth prayer, which sets forth this proposition, this was made the law of this case. (See *Consolidated Ry. Co.* v. *O'Dea*, 91 Md. 510; *Rosenstock* v. *Ortwine*, 46 Md. 333; *P. W. & B. R. R.* v. *Harper*, 29 Md. 330; *Baugher* v. *Wilkins*, 16 Md. 35); and regardless of the

concession, such is the law.   *Serio* v. *Murphy*, 99 Md. 556; *South Balto. Car Works* v. *Schaefer*, 96 Md. 88, 103; *Balto. & Potomac R. R. Co.* v. *State, use of Abbott*, 75 Md. 152; *Nason* v. *West*, 78 Me. 253; *Tex. & Pacific Rwy.* v. *Barrett*, 166 U. S. 617; *Patton* v. *Tex. & Pacific Rwy.*, 179 U. S. 661, 662.

We look in vain throughout the whole record to find what caused the fall of the wall.   It had stood for a month after the fire and, so far as the evidence shows, no change was made in or about it except the removal of the canned goods, and yet suddenly and without warning it falls.   If the plaintiff says it fell because it was a wall which had passed through a great fire, the answer is, all walls that have been through great fires do not fall, and you knew that this wall had been through a great fire just as well as the defendant.   If he says that its fall was due to the removal of the canned goods, the answer is:   He helped in the work, and the evidence shows that the removal of the canned goods had nothing to do with the fall, for it appears that the wall stood until all but eight or ten cases of goods had been removed, and every one knows that, if the wall had been dependent upon the canned goods for its support, it would have fallen long before the number of cases had been reduced to eight or ten ; and it also appears that the wall fell at a point estimated at about a story and a-quarter above the cellar where the goods were stored.   If the plaintiff attributes the cause of the fall to a latent defect in the wall, the reply is, that he must show what was the character of the defect, for *non constat* it was discoverable and the record is absolutely silent as to the existence of any latent defect in the wall. Not one witness testifies what caused the wall to fall.

This being so, how can the jury be left to speculate as to the the cause of the fall?   In *Durst* v. *Carnegie Steel Co.*, 173 Pa. 166, wherein the plaintiff was injured while doing excavation by a cave-in, and the charge was, that the defendant was negligent in not knowing of the presence of a sewer near which the excavation was being made, it is said : "The evidence does not show that the accident was caused by the presence of the

sewer.   There was no evidence that there was any indication of weakness before the accident happened, presumably there was not, or the foreman would have ordered the shoring.   There was no evidence of the condition of the ground afterwards ; whether it fell from the top only or from under the sewer as well.   So that the fact that the accident was caused by the sewer would only be an inference from the fact that after the fall it was exposed.   In other words, it would be to infer negligence from the happening of the accident merely."   See *Quinn* v. *Baird*, 63 N. Y. S. 237 and 238.

In *Larich* v. *Moies*, 18 R. I. 513, the plaintiff was in the employ of the town of Lincoln shovelling sand at a bank which left an overhanging crust.   The plaintiff saw it ; one of his fellow-laborers went to knock it down, and the foreman was told it was dangerous, but he called back the laborer, saying, "There is no danger.   You load up.   I don't want the bank at present.   I want the sand and must have it."   He also said that after they had gotten one load of sand he would throw down the bank.   The Commissioner of Highways had previously notified the men, including the plaintiff, to be careful about the danger from the bank.   Before the load was completed the bank fell, and the plaintiff was injured.   It did not appear what the condition of the overhanging crust was.   The plaintiff was non-suited : The Court said : "If it was not obvious (the danger from the overhanging crust) there is nothing to show negligence.   For aught that appears the foreman simply erred in judgment, and this is all the more probable from the plaintiff's own statement, that he had been in places where he would suppose there was ten times more danger than there was there that day."   See *Labatt on "Master and Servant*," vol. 2, pp. 2314 to 2320.

The evidence shows that Ratinger had been at this place from time to time during the progress of the work, and at the time of the accident he was within seven feet of this wall.   And yet it is to be contended that simply because he said he wanted to get the canned goods out before he pulled down the walls, without showing that the conditions existing there

would not have led the most prudent man to adopt the same course. The following, we think, is ample to settle this proposition : "There is no evidence whatever that the defendant's servants or agents had any reason to anticipate a danger from the condition of this machinery to any one. On the contrary, very persuasive evidence of the fact that they had not is to be found in the evidence given by the plaintiff's witnesses and emphasized by that of the defendant that the directing officers of the defendant were daily around this machine, and sometimes repeatedly, during the day, in close proximity of this revolving shaft, and that one of such officers stood in the immediate vicinity of the plaintiff when the accident happened." *Breen* v. *The St. Louis Cooperage Co.,* 50 Mo. App. 213. See *South Balto. Car Works* v. *Schaefer,* 96 Md. 107; *Md. Tel. Co.* v. *Cloman,* 97 Md. 628.

The plaintiff offered the testimony of three witnesses who said that these walls looked perfectly solid and straight, and one of them testified that he looked at them every day and discovered no defect in them. With this evidence in the record, upon what can the plaintiff stand? This, we think, settles this·case, no matter if the evidence showed positively that there was no inspection whatever. With the evidence entirely silent as to the cause of the accident, with every positive fact pointing to some latent defect that could not be discovered by reasonable inspection as the cause of the accident, is it possible that there can be a recovery in this case? Stewart tetified that he, Ratinger and Friehagy examined one of the walls after McCuen's notification and determined it was unsafe, and it was pulled down. That they would go all around, all through the lot every day and look at the walls, and that they did not pull down the vault wall because it was solid. What further inspection Ratinger or anyone else made, he could not say.

Supposing there were some evidence of the dangerous condition of the wall prior to the fall thereof, yet the dangers resulting therefrom would be so open and obvious as to amount to an assumption of risk on the part of the plaintiff.

We think there can be no escape from this proposition. If

McCuen's testimony is to have any force whatever, it must be given the meaning that he, by merely looking at these walls, while the work was in progress, determined that they would fall by reason of that very work. This interpretation must be given to it, in order to have the remotest bearing on this case, and if this is the evidence relied on to show negligence, how can the result be avoided, that such danger was perceptible by every man of ordinary capacity? No expert or technical knowledge is claimed for McCuen. What he knew or concluded, was simply a result of the ordinary faculties of observation. We maintain that the conclusion is irresistible, that the plaintiff would be bound to have known and to have seen what a man of ordinary knowledge, and means of knowledge would see.

Four ordinary men looked at this wall a number of times during four or five days, and concluded it was safe. One ordinary man looked at it once, under the same conditions, and determined that it was unsafe. The plaintiff asks that his own testimony and that of three other witnesses, be blotted out, and the proof stand that the wall was unsafe. Grant him this privilege, and what is the result? We are not concerned here with any warranty of the master that the appliances or place of work are reasonably safe. Here the whole evidence, if it be claimed that there is any, is to the effect that a wall around which the plaintiff was working, was so openly, obviously and palpably dangerous, that an ordinary man looking at it for five minutes, in the most casual way, could see that danger. And still it is to be claimed that this man had a right to rely upon the presumption that the master had discharged his duty, in the face of his claim that his own evidence shows that the violation of that duty was obvious to an ordinary observer. *Griffn* v. *The Ohio Miss. Ry. Co.*, 124 Ind. 326; *Pederford* v. *City of Rushford*, 41 Minn. 290; *Mielke* v. *Chicago & N. W. R. Co.* 103 Wis. 1; *Kanz* v. *Page*, 168 Mass. 218; *Olson* v. *McMullen*, 34 Minn. 94.

Even if it be granted that there is evidence in the case legally sufficient to show that the walls were unsafe prior to the hap-

pening of the injuries complained of, yet there can be no re-
covery in this case as the evidence clearly shows that the
negligence, if any, bringing about such unsafe condition, was
the negligence of plaintiff's fellow-servant as to one of the de-
tails of the work in which they were both engaged.    In other
words, that Ratinger, the foreman, so far as it was his duty to
guard and inspect the walls that fell, and to determine whether
they were in condition to stand at any time during the pro-
gress of the work by reason of anything done to them, or
about them, or, that under the existing condition they should
be pulled down, was discharging a duty properly delegable to
him, and that for his negligence or error of judgment in this
particular, there can be no liability on the part of the defendant,
as Ratinger was plaintiff's fellow-servant.

It is a well-settled principle that where a servant is employed
by the master in a certain kind of work, the nature of which
is such that certain dangers may arise from time to time, as
the work progresses, the master has discharged his full duty
if he provides his servants with the means of protecting them-
selves against those dangers.    And, further, that it matters
not whether these means are put in the hands of one man or
of all commonly, whether it be left to one or all to decide
when such danger exists as to require the use of the means
he had provided.    If it be left to one man, and he is perfectly
competent to be entrusted with that duty, then, if in the dis-
charge of that duty he is negligent, the master is not re-
sponsible.

The reason for this rule is, that where the work is being
done of such nature that the conditions are constantly chang-
ing with the progress of the work, it is unreasonable to expect
the constant presence of the master for the purpose of himself
protecting his employees.    The duty of protecting themselves
against the perils of this work is one of the incidents of the
*work* itself, for which they are employed.    If this wall had
become dangerous, from the reason which McCuen assigned,
it was a duty rightfully imposed upon Ratinger to pull it down
at that time, and if he erred in judgment in such a way as to

be guilty of negligence, it was negligence in the conduct of the work itself, attributable to a fellow-servant only. *Coal Co. v. Floyd,* 51 Ohio, 557; 25 L. R. A. 856; *Cleveland R. Co. v. Brown,* 73 Fed. R. 974; *Heald v. Wallace,* 71 S. W. Rep. 84; *Armour v. Hahn,* 111 U. S. 313; *City of Minneapolis v. Lundin,* 58 Fed. 525; *Railway Co. v. Jackson,* 65 Fed. 48; *Finalyson v. Utica Mining and Milling Co.,* 67 Fed. 510.

"It frequently happens that men are employed to tear down buildings or other structures, or to repair them, after they have become insecure, or it may be that the work undertaken by the employee is of a kind that is calculated to render the premises or place of performance for the time being, to some extent, insecure. In cases such as these, the servant undoubtedly assumes the increased hazard growing out of the defective or insecure condition of the place where he is required to exercise his calling, and the doctrine above stated cannot be properly applied." *Gulf, C. & S. F. Ry. Co. v. Jackson,* 65 Fed. 50; *Eckhardt v. Lazarette Co.,* 90 Md. 192.

*James Fluegel,* for the appellee.

The record shows that the wall that fell and injured the plaintiff had passed through the great fire which lasted two days, viz.: February 7th and February 8th, 1904, and that when the firemen came to rescue the plaintiff the mortar was falling out from between the bricks. That from the time of fire until the day of the accident no steps had been taken by the defendant to inspect the wall and thereupon to either brace it up or tear it down. That the effect of fire on a wall was very severe. As the heat of the fire would naturally take all the plastering off, and if it was left standing there a certain length of time the mortar would become crumbled. That the drying up of the motar weakened the wall and made it unsafe. The plaintiff also showed that the only support that the wall had, was the vault filled up with cans and the jury could naturally infer that the taking away of thousands of cans from the vault where the plaintiff was working without bracing up the wall after it had been denuded of the adjacent wall, would leave it

in a dangerous and unsafe condition; without any apparent cause other than stated, the wall did thereupon actually fall over on a quiet day.   This *was four days after the vice-principal had been informed* that *he must stop his men working at once and tear the wall* down ;  it is therefore submitted that there is sufficient legal evidence to conclude that the wall was at the time it fell, and had been for several days prior thereto, in a dangerous and unsafe condition.   The Assistant Building Inspector was asked: "Do you know whether or not this wall was actually dangerous ?  Answer: "No more, in my judgment, than when they got the debris out of the cellar, it would be so weak, there being no support to it, it would fall."  The defendant's counsel made a point at the trial that all the witnesses for the plaintiff testified that the wall looked solid and gave no indication of being dangerous and unsafe.  This Court has already said that where a plaintiff avers that he did not know of an existing danger by which he was injured, and there is no direct evidence to the contrary it must assume his testimony relative thereto to be true.  On the other hand, the evidence as mentioned heretofore disclosed the fact that hardly had the Assistant Building Inspector of Baltimore, informed McCuen that he must *stop the men working at once and pull down the wall*, that Stewart, the foreman, did in turn communicate that warning to the vice-principal Ratinger; the latter, while not denying that there was great risk in continuing the men at work, failed to impart to them or the plaintiffs what to he had learned of the lurking danger and neglected to either pull down the wall or brace it up.  This conduct of Ratinger's was the result of his own calculation, which in his own words were" "that if he pulled that wall over then there would be that much more trouble on account of the dirt and stuff in getting the canned goods out, and he wanted the canned goods out before he pulled the wall.  The warning received by Ratinger from McCuen through the foreman Stewart, was undoubtedly sufficient to charge him with the knowledge of the true condition of the wall and it became then the defendant's duty to protect its workmen.  *Strickling's case*, 88 Md. 507.

The fourth ground of the defendant, for its exception to the plaintiff's first prayer was that "There is no evidence that Ratinger had been informed, prior to the plaintiff's being injured, of the unsafe condition of the place where the plaintiff's worked as mentioned in plaintiff's prayer." The foreman Stewart stated that McCuen told him that the walls were unsafe and said,"*You will have to stop your men from working there and pull them down.*" That this was two or three days before the accident. That Ratinger was not at work when McCuen was there, but Stewart subsequently informed Ratinger when he came back, of the notification on the part of McCuen. That Stewart told McCuen he could not stop the men, but would have to wait until Ratinger came back. That the men continued working. The accident happened Tuesday and Stewart thinks he was notified the Friday or Saturday before by McCuen. In answer to the direct question by *plaintiff's counsel: "Under whose direction did the men work after you notified Ratinger of McCuen's statement?"* The answer promptly was, "*Mr. Ratinger's.*" *Ratinger's answer to* Stewart also confirms the fact that he did have knowledge of the unsafe condition of the place where the plaintiff worked prior to the plaintiff *being injured, and that in time to have avoided the accident, by simply notifying the men, including the plaintiff, to stop work, until proper precautions could have been taken to either make the wall safe or tear it down.*

The plaintiff having therefore offered direct evidence to sustain the issue of fact to be tried by the jury, it was solely for the jury to determine whether the testimony offered, justified a conclusion of negligence on the part of the defendant.

From the moment that Ratinger was informed of *McCuen's message, the risk resulting from the further exposure of the men to danger, was that of the master, and as the* plaintiff was not *warned to desist his work, he was entitled to assume that the master had provided a safe place for him to work in.*

In *Conner* v. *Durite Mfg. Co.*, 156 Mass. p. 163, the Court held that the master must exercise reasonable care and supervision over his employees and see that they do their duty.

In 21 *Ency. of Law, A. & E.,* 491, the rule is laid down that the defendant is liable, even if intervening causes produced the injury, provided those causes might have been anticipated, and a number of cases are cited in support of that rule. In *Kamke's case*, 63 Md. 281, this Court held that the falling of a house was alone *prima facie* evidence of negligence, when nothing else had been shown by which it could be inferred that the falling was due to causes not warranting such conclusion.

McSHERRY, C. J., delivered the opinion of the Court.

The appellant is a body corporate engaged in the prosecution of a general salvage business. After the great fire which caused a vast destruction of property in Baltimore City on February the seventh and eighth, nineteen hundred and four, the appellant contracted to remove a quantity of canned goods from the cellar of a building which, before the fire had consumed it, had stood on South street. The plaintiff, who is the appellee on this record, was one of a number of men employed by the appellant to do the work of removal. Several walls or parts of walls of the building were standing after the fire was extinguished and at the time the salvage work was commenced. In the declaration it is alleged that "the building was dangerous and unsafe to work in," and that the "dangerous condition of said building was known to the defendant but unknown to the plaintiff. That the plaintiff while using due care and caution in the said building was, by the negligence of the defendant in thus having him work in the said dangerous and unsafe premises, * * * seriously and permanently injured * * * by the collapsing of a wall and other parts of the said building." The case went to trial before a jury upon the issue joined on the plea of not guilty and resulted in a verdict against the defendant. From the judgment entered on that verdict the pending appeal was taken. During the progress of the trial five exceptions were reserved. Four of them relate to rulings concerning the admissibility of evidence and the fifth brings up for review the action of the

trial Court on the prayers submitted for instructions to the jury.

As this is a suit by a servant against the master to recover damages for a personal injury sustained by the former in the course of his employment, negligence is the *gravamen* of the action. The negligence averred in the declaration consisted, if it existed at all, not merely in a failure of the appellant to exercise ordinary care to provide its servant, the appellee, with a reasonably safe place in which to perform the labor he had been employed to do, but in deliberately putting him to work in the ruins of a building known by the appellant but unknown by the appellee to be in a dangerous condition. The alleged negligence relied on to sustain a recovery was, therefore, not simply an *omission* to discharge some duty which the master owed to the servant, but involved an affirmative act of *commission* in the assignment of the servant to a situation which the master knew and the servant did not know to be perilous and insecure. Under the declaration it was incumbent on the appellee to prove by legally sufficient evidence, first, not only that some of the walls of the building in question which were left standing after the fire, were in a dangerous condition and liable to fall, but that the identical wall, which by falling caused the injury complained of, was also in that same condition when the appellee was placed or retained at work in close proximity to it; secondly, that the appellant had knowledge of the dangerous condition of the wall which by collapsing, injured the appellee, and that it, the appellant, possessed that knowledge prior to the occurrence of the accident; and thirdly, that the appellee was ignorant of the danger and by the exercise of proper prudence and care could not have discovered it before the wall fell upon him.

A brief outline of the facts appearing in the bills of exception must be given before turning to a consideration of the legal principles which underlie and will control the final decision of the several questions presented to this Court by the record.

The building, in the cellar of which the appellee and others

were working when the accident happened, had been com-
pletely destroyed by the fire.   Some partition walls and a
brick vault which extended from the cellar to the top story
were left standing.   All of the wood material had been con-
sumed by the flames.   The fragments of the walls still stand-
ing and the brick vault were not supported by any of the
timbers which had formerly tied the outer and the inner walls
together.   The ruins showed merely a heap of debris, a few
fragments of walls and the remnant of the brick vault.   This
vault was built of brick and was about four or five feet square
with openings into it on each floor.   These openings in the
face of the vault had iron doors attached.   Thus the tenants
of each floor were provided with a vault for the protection of
their books and papers.   After the fire this vault stood for a
heighth of thirty or thirty-five feet and presented the appear-
ance of a square stack or chimney with iron doors opening into
it at each floor.   The cellar of the house was divided up into
arched compartments and in these the cases of canned goods
were closely packed.   In order to get them out, after the fire,
it was necessary to dig through the arched tops of the com-
partments, and this was done by the appellee and the other
laborers engaged in the work of removing the goods.   The
work of removing the cases had progressed for several days
under these conditions.   There was a foreman who had charge
of the hands, and both the foreman and the hands worked
under a man named Ratinger, who had full charge of and
supervision over the salvage work for the appellant company.
Several days before the accident happened James W. McCuen,
an inspector of furnaces, who was a subordinate of Building
Inspector Preston, went to the premises where the appellee
and the other employees of the salvage company were work-
ing, and told the foreman "to take care of the walls as they
were coming down as it was dangerous for the men to go
further down without taking care of them; and he said he
would."   This message was delivered to the foreman be-
cause Building Inspector Preston, who had not seen the con-
dition of the walls and who had no personal knowledge con-

cerning them, had been informed "that there were some men working in a cellar on South street where it was dangerous." The building inspector directed McCuen "to go down there and notify them to take care of the walls if they continued working there;" and McCuen without making any minute or even casual inspection of the walls, because, as he says, he did not have time to do so merely communicated to the foreman the warning sent by Mr. Preston. The foreman thereafter repeated to Ratinger the message delivered to McCuen. After McCuen had left and after Ratinger had learned from the foreman what the building inspector had directed to be done, one of the walls was thrown down under the supervision of Ratinger, but the vault stack was allowed to remain. There is not a particle of evidence in the record to show that the vault walls—the four walls forming the four or five feet square vault stack—were unsafe or dangerous or even impaired. On the contrary three witnesses examined on behalf of the appellee—they being the foreman and two of the eighteen men employed by the appellant—distinctly and emphatically say they thought the vault walls perfectly safe because they were solid. McCuen did not tell the foreman that the vault walls were unsafe. He did not go into the cellar; he made no special inspection of the vault walls; he is not a builder but a furnace inspector; and he testified that he thought in his judgment "if they would attempt to clear that debris out without protecting the walls, before they could get away from them they would weaken and would fall down." He further testified "the way it looked to me, to clear the debris out that was there, without first protecting the wall, it might possibly fall after the debris was away. I wasn't making any particular inspection of that particular work. I was going around delivering messages to them who had charge of the gangs pulling down different walls." On March the seventh, 1904, it rained and no work was done by the men on the premises in question, though they had worked there several days the previous week. On the following day, March the eighth, work was resumed and whilst the appellee and other laborers were in the cellar and

whilst Ratinger was standing within a few feet of the vault, the vault walls fell and injured the appellee and other workmen. There is nothing in the record to show *what* caused the vault walls to fall. To all appearances they were solid and safe and though McCuen, when testfying in the case a year after the accident had happened, stated that in his judgment "when they got all this debris and stuff out of the cellar, it seemed to me, it would so weaken the wall, there being nothing to support it, it would fall," he did not venture to say how much of the debris would have to be removed before the walls would give away, nor was any evidence whatever adduced to show that the removal of the debris actually caused the walls to fall. This vault stack, as has been remarked, extended up the heighth of the building, and the upper half toppled over and fell inwards leaving about a story and a-half of it undisturbed. It certainly could not have been foreseen by any one that the upper part of this quadrilateral brick structure would separate from the lower part about midway of its entire elevation and that the top portion would fall, in the way it did.

It is a general rule, not, however, without very important exceptions at least one of which will be alluded to later on, that it is the duty of the master to exercise ordinary care to provide a reasonably safe place in which the servant may perform his services. *Eckhardt* v. *Lazaretto Co.,* 90 Md. 192; *Armour* v. *Hahn,* 111 U. S. 318. A failure of the master to do this, in the instances where it is his duty to do it, is negligence, and if an injury to the servant results therefrom and is the direct consequence thereof, an action will lie. A master is not an insurer of the servant's safety. *Wood* v. *Heiges,* 83 Md. 269. His liability, if any liability attaches at all, depends altogether upon a breach by him of some imposed duty. Laying aside for the moment all the exceptions to the general rule requiring the master to exercise ordinary care to provide a reasonably safe place for the servant to work, what evidence is there in this case of a breach of the duty imposed by the rule? The concession by the appellee of the appellant's fifth prayer which instructed the jury that the mere falling of the

wall by itself was not sufficient evidence of negligence on the part of the appellant, excluded any inference of negligence from the naked act which caused the injury. *Serio* v. *Murphy*, 99 Md. 556. The concession of the prayer made the legal proposition which it announced the law of the case, whether that proposition was right or wrong. *Con. Ry. Co.* v. *O'Dea*, 91 Md. 510. But the legal proposition contained in the conceded prayer was right. *South Balto. Car Works* v. *Schaefer*, 96 Md. 105. The case at bar is distinguishable from *Treusch* v. *Kamke*, 63 Md. 278. That was an action to recover damages for an injury sustained by the fall of a house which had been so carelessly and negligently erected and with such insufficient and improper materials that in consequence it suddenly fell, and in falling injured the plaintiff. It was held that "the fact of the fall itself was at least *prima facie* evidence of improper construction, and entitled the plaintiff to call upon the defendant to explain it to the satisfaction of the jury." Here, however, we have no inquiry concerning a faulty or negligent construction. A house properly and carefully built with sufficient and suitable material would not suddenly fall and the owner who built it, if it did so fall, would be bound to explain the cause of the collapse if he wished to free himself from the consequences resulting from conditions for the existence of which he was himself responsible. The case in *63 Md.* was not one between master and servant. In the case now before us no question as to improper or negligent construction is concerned, no suit is pending against the builder of the vault walls and no inference as to the dangerous condition of the walls can be drawn from the mere fact that the walls fell, unless it be assumed that they could not have fallen had they not been in an unsafe and dangerous condition. But to assume that would be to assume as true the precise thing to be proved, and that assumption, when adopted would then be substitued for evidence tending to establish the fact to be proved. Such a process would permit negligence to be inferred from the simple happening of the accident. In a case like this that cannot be done.

Something else, then, in addition to the mere falling of the vault walls, must be found in the record before it can be held that there was evidence tending to prove that the place where the appellee was employed to work was dangerous. One wall of the building had been torn down by city employees, and after the warning message delivered by McCuen had been communicated to Ratinger by the foreman, another wall was demolished by the appellant's workmen; but neither the city employees nor the appellant's workmen disturbed the vault walls. If the vault walls had presented any indications of being in a dangerous condition at the time the other walls were leveled it is scarcely probable that they would have been allowed to remain standing. Indeed, it is reasonably certain they would also have been destroyed or strengthened. They appeared to be solid and secure, and the fact that they formed a square compact column which had stood firmly for a month after the fire, seemingly unaffected by it, and without exhibiting any signs of weakness whatever was calculated to induce a belief that it was not necessarily or even probably hazardous to remove the cases of canned goods from the cellar before either razing the walls or shoring them up. The evidence does not show what caused the vault walls to fall. The conjecture of McCuen that if the debris were removed the walls would fall is at best a mere speculation, because there is nothing in the record to show either that the debris had been removed, or if removed to what extent it had been taken away, or what causative relation existed if any, between its removal and the collapse of the walls.

Nor does the testimony of Emerich, the district chief of the Fire Department, tend to show that the walls were dangerous before the accident happened. He was summoned to the scene after the walls fell and he knew nothing concerning them prior to that time. He aided in rescuing the men imprisoned by the debris. He found it necessary *then* to shore up the portions of the walls left standing, before he would permit his subordinates to extricate the appellee. But the condition of the remnants of the walls *after* the upper half of

them had toppled over gave no indication of their condition *before* their collapse. The physical appearance and the actual *status* had wholly and completely changed.

But if it be assumed, or for the moment be conceded, that there was some legally sufficient evidence tending to prove that the walls which fell, and which by falling caused the injury complained of, were in a dangerous and unsafe condition when the appellee was put to, or retained at, work in the cellar, then it is certain, in the absence of any proof as to *what* caused them to fall, that the means of knowing the danger and the peril incident to the removal of the canned goods were as open and obvious to the appellee as to the appellant. It will not do to say that the information imparted by McCuen to the foreman and by the latter to Ratinger apprised the appellant of a hazard and a risk of which the appellee was ignorant; because in the last analysis all that McCuen definitely said to the foreman was to repeat Mr. Preston's instructions "to all people cleaning out debris" that they should "take care of all dangerous walls before getting the debris out." The dangerous walls were not pointed out and Ratinger, the foreman and the eighteen men at-work under the latter each had precisely the same opportunity to see, and to judge as to, the peril involved in doing the work in which they were engaged, under the then existing surroundings. An employee who contracts for the performance of hazardous duties assumes such risks as are incident to their discharge from causes open or obvious, the dangerous character of which he had an opportunity to ascertain. *B. & O. R. R. Co.* v. *Stricker*, 51 Md. 47. One who remains in a service which necessarily exposes him to hazardous risks from causes open and obvious, the dangerous character of which he knew or had an opportunity of knowing, must be considered as having assumed such risks, and if injured in consequence thereof, has no claim against the employer. *Penn. R. R. Co.* v. *Wachter*, 60 Md. 395; *Yates* v. *McCullough Iron Co.*, 69 Md. 370. This doctrine, firmly grounded in the law of this State, in the law of England and of probably every State in the Federal Union,

though usually stated as a general rule constitutes, in reality, an exception to or qualification of the broad principle which requires the employer to use ordinary care to provide a reasonably safe place in which the servant may perform his work. It may be taken, then, as a postulate that a servant who, on entering into a contract of employment, knows of the dangers of the premises or place of work, or by the use of ordinary care could see and understand them, assumes the risks which arise therefrom. 20 *Am. & Eng. Ency. L.*, 114. Knowledge by the servant of defects in appliances has been held in legal contemplation to carry with it knowlege of the risk and danger incident to the use of such appliances; and in such instances the law imputes and presumes knowledge of the risk and danger, and will not allow the injured workman to aver or prove that he had no actual knowledge thereof. *Yates* v. *McCullough Iron Co., supra.*

Whatever danger or hazard there was in performing the work which the appellee had been employed by the appellant to do, was the danger or risk that unsupported and isolated walls, which had been subjected but recently before to the effects of the intense heat produced by a mighty conflagration, would, without warning and without the intervention of other forces than those set in motion by the laws of nature, suddenly collapse and fall, and in falling, occasion the precise injury which actually befell the appellee. He saw the denuded walls rising up to a heighth of thirty-five feet above the place where he was working—they confronted him as he stepped upon the premises—and he had aided in throwing down one of the walls because it was more threatening than the others ; and he must have known that a gale of wind or a vibration produced by the dynamiting of other walls in proximate sections of the burnt district, or a jar resulting from the fall of other walls in the vicinity, or the absorption of rain by the exposed mortar, might cause the vault walls to totter and fall. He must have known all this, because we are bound to assume he was a man of average intelligence, as there is "no proof that he was stupid or dull of intellect, that

any of his senses were impaired, or that he was not possessed of ordinary powers of observation." *Yates* v. *McCullough Iron Co., supra.* If the place was really dangerous the appellee must have known that it was, because the means of knowledge were as open and obvious to him as to the master; and by voluntarily working there he assumed the risks of being injured by causes which were open and obvious ; and he cannot hold the employer responsible in damages if those open and obvious causes produced the injury. If, on the other hand, the place where he worked was not a hazardous one—if the walls which, in falling, injured him, were not in a dangerous condition—then there was no breach by the master of the duty owed to the servant to use ordinary care to provide a reasonably safe place in which the servant might perform his service ; and there being no breach of that duty no action can be maintained even though, in consequence of an accident resulting from some unexplained cause, an injury has been sustained. In either event—upon either hypothesis—there was no adequate cause of action. Such being the situation, the eighth prayer presented by the appellant withdrawing the case from the consideration of the jury ought to have been granted. That prayer sought to take the case from the jury because of a failure on the part of the appellee to adduce any legally sufficient evidence to show that the appellant had violated any of the duties it owed to the appellee. Holding as we do, for the reasons that have been given, that the prayer should have been granted, it becomes unnecessary to allude to or discuss the instructions which were given or the questions which are raised by the other bills of exception. As no recovery can be had, the judgment will be reversed without awarding a new trial.

> *Judgment reversed with costs above and below without awarding a new trial.*