# STATE OF MARYLAND, TO THE USE OF KATE T. JOYCE ET AL., *vs.* PATRICK FLANIGAN ET AL.

*Relation of Evidence to the Issues—Action Against Employer for Death of Workman Caused by Gas in a Sewer Trench— Evidence—Experts—Duty of Master to Furnish Safe Place for Work.*

A party has the right to have the evidence confined to the issue made by the pleadings, and consequently, when a declaration alleges that the defendant negligently failed to ascertain the presence of poisonous gases in a sewer trench being dug, or to remove them, or notify a workman of their presence, evidence as to the provision of means of egress from the trench is not admissible.

When the question is whether the defendant ought to have provided against the possible existence of gas in a trench, evidence that the gas was discovered in a pit dug alongside of the trench ten months afterwards is not admissible as tending to impute knowledge to the defendant on the previous occasion.

A contractor who testifies that he had twice made excavations in soil like that involved in this case is not qualified to testify as an expert as to the probable existence of gases in such soil.

When the evidence shows that the injury constituting the ground of the action was caused by the presence of a poisonous gas in a pit, but there is no evidence as to whence it came, a question to a witness is improper which assumes that the gas emanated from the soil itself.

A question is also improper which assumes that the soil was composed of garbage containing vegetable matter when that is denied by the defendant.

Evidence as to what was known and done by contractors for digging trenches in reference to gases in the soil, after the happening of the accident in question, is not competent to show their knowledge or proper method before that event.

A witness who has made no personal observations as to the formation of gases in the earth or in pits, and noted the effect of air on garbage, or made tests as to decomposition, but whose knowledge is derived from reading, is not qualified to testify as an expert on the subject, since an expert must be qualified by experience as well as by knowledge of theory.

A witness who has had no practical experience in removing gases from excavations cannot be asked whether there is any way, and if so what, to disperse such gases.

A witness who states that he has had no experience as to the formation of gases during actual excavation work, but only in electrical conduits completed and in use, is not qualified as an expert to answer the question, whether there is any effective way of dispersing or preventing the accumulation of carbonic acid gas in dangerous quantities in excavation work.

Plaintiff's deceased, a workman employed by defendant in excavating a trench for a sewer, was overcome by poisonous gas at the bottom of the trench and killed. In an action to recover damages for the death so occasioned, plaintiff alleged that defendant knew, or ought to have known, of the presence of the gas, and of the danger therefrom, and negligently failed to ascertain its presence or to remove it, and failed to notify the deceased of the danger, who was himself ignorant thereof. The evidence of the plaintiff showed that the soil where the trench was dug was composed of ashes and other rubbish, dumped there to fill up an old ravine; that the men had worked in the trench for six days continuously and no gas had been discovered, and that it was early in the morning of the seventh day, when the men returned to work, that the casualty occurred. The expert evidence was that the decomposition of garbage containing vegetable mater, when in contact with air, produces carbonic acid gas, which will not support combustion, is much heavier than air, sinking to the lowest accessible level, and when present in quantities ranging from three to ten per cent. of the atmosphere is dangerous or fatal to human life. On the part of the defendant, there was evidence that in the case of previous excavations made in similar soil no gases had been encountered, and that, on the afternoon of the day before the accident, a lighted lantern

had been taken to the bottom of the pit and not extinguished. *Held,* that since there is no evidence of the existence in this soil of any organic matter likely to develop dangerous gases when brought in contact with the air, or knowledge thereof by the defendant, and no evidence of any general custom among those engaged in work like that of this excavation to take precautions for the discovery of gas, and no evidence as to the source or origin of the gas which caused the casualty, the jury was properly instructed that under the pleadings in the case, there was no evidence legally sufficient to entitle the plaintiff to recover.

A master is not bound as an insurer to furnish his employees with a safe place in which to work, but is only bound to exercise reasonable care to provide a safe place, and to guard agaist probable risks, not against all possible dangers.

Whether the master has exercised that reasonable care in providing a safe place is to be determined by the ordinary usages of the particular work or business.

*Decided December 9th, 1909.*

Appeal from the Court of Common Pleas (ELLIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE and THOMAS, JJ.

*R. E. Lee Marshall* and *John G. Schilpp,* for the appellants.

*William L. Marbury* and *William P. Lyons* (with whom was *Walter L. Clark* on the brief), for the appellees.

PEARCE, J., delivered the opinion of the Court.

This is an action brought by the State for the use of the widow and infant children of Peter Joyce, deceased, to recover damages for his death caused by the alleged negligence of the defendants, co-partners, trading as P. Flanigan & Sons.

The defendants are contractors engaged in laying drain-pipes and building sewers, the senior member of the firm having been in that line of work in Baltimore City for twenty-three years, and the deceased was a laborer in their employment, and at the time of his death was assisting in excavating a trench for a sewer near the corner of Maryland avenue and Twenty-Eighth street in said city. The declaration alleges that "while engaged in the conduct of his said employment, the said Joyce, on or about the 19th day of September, 1907, in obedience to the directions and orders of the defendants, descended into said pit and was thereupon overcome by certain noxious or poisonous gases accumulated in the bottom of said pit, in consequence of which he died on the day aforesaid." It further alleges that "the defendants knew, or by the exercise of ordinary care ought to have known of the presence of said poisonous gases in said pit, and of the risks and dangers attendant thereon, but the said Joyce had no knowledge or means of knowledge of the same; that the defendants negligently and wrongfully failed to ascertain the presence of said gases, or to take any steps to remove the same before sending said Joyce into said pit, and negligently failed to give any notice or warning to said Joyce of the presence and danger of encountering said gases; and that said Joyce used all due care and prudence on his part, and that his death was wholly due to the negligence of the defendants, without any want of care on his part." There were fourteen exceptions during the course of the trial to the rulings of the Court upon questions of evidence, and at the close of the testimony on both sides the Court instructed the jury that under the pleadings in the case there was no evidence legally sufficient to entitle the plaintiff to recover and that their verdict must be for the defendants upon the issues joined. The fifteenth exception was taken to this ruling, and the appeal is from the judgment entered on the verdict for the defendants.

George Zimmerman, inspector of drains in the Engineer's Department of Baltimore City, testified that the appellees

applied for and received a permit to lay a 20-inch drain-pipe
from St. Josephs House of Industry to the conduit of Sum-
walts lane and 29th street; that they started on September
13th, 1907, to dig through the bed of 29th street to tap the
sewer under this street, and that on the morning of Septem-
ber 19th, the work had so far progressed that the opening in
the street was 23 feet 6 inch deep, 8 feet 6 inch long, and 4
feet 6 inches wide; that it was his duty to inspect such work,
and that he did so for that purpose twice each day; that he
was there on the morning of September 19th about 9.30 and
that the inspection disclosed the same condition as the day
before, except that the opening was a little deeper, and that
it was 25 feet from the surface of the street to the arch of
the sewer to be tapped; that there was nothing but rain water
in the opening, and no connection had then been made with
St. Josephs House of Industry. The accident occurred about
8 A. M., September 19th. There were three platforms in the
excavation, constructed to pass the earth from one to another
in removing it from the excavation, and these platforms were
also used to get into and out of the pit. Two of these plat-
forms were on one side and one on the other; one near the
top on the west side, the second lower down on the east side,
and the third still lower on the west side.

Charles Jordan, foreman of the gang, testified that about
7.30 on the morning of the accident, the planks with which
the hole was covered for safety during the night, were re-
moved, and the men prepared to go down to work; that he
had other men at work nearby, and he himself was with them
about 200 feet from this hole; that in a few minutes after the
removal of the planks covering the hole, someone called out
that something was wrong with Joyce in the hole; that he
immediately ran, and jumped from one platform to another
to the bottom of the opening where Joyce was lying on the
earth, with Glick and Smith, two of the gang, trying to get
Joyce out, and he endeavored to help them; that in half a
minute Smith dropped also and Glick let go and came out of
the pit; that he held on longer but was also forced to let go

and come out and that Joyce and Smith were both dead when taken out a little later; that he neither smelled nor tasted anything while in the pit, but that his legs became weak and gave way, and everything turned black, but he did not know what caused this.

Joseph Semone and Thomas Burns, bystanders, bravely volunteered to attempt the rescue of Joyce and Smith, and Semone was first lowered by a rope and was brought up with the body of Joyce, and Burns in like manner was lowered and brought up with the body of Smith. Semone testified that while in the pit "he had no feeling at all; the air in the pit just took charge of him; it just went through him, just took all the feeling out of him; that the thing which had affected him, he would call foul air accumulated from garbage that was dumped there; that he had known the locality for five years, and that the soil through which this hole was dug was garbage and collection of the street ashes and such stuff as that on the bottom, and that he had seen it filled in.

Burns testified that he felt "the same sensation as anyone had who caught hold of electricity and had it go through you; that he did not smell anything because he had a handkerchief tied over his nose, and that he had no taste in his mouth from the substance, whatever it was."

Charles Jones who was working nearby for the Peoples Sewer Contracting Company heard the cry that there was something wrong in this pit, and he tried to go down to the rescue, but when he got to the second platform "everything turned blue and he crawled out; that he smelled nothing, but had a taste in his mouth, and felt himself becoming weak; * * * that he knew the locality all his life; that the soil is just a bed of garbage, ashes and street dirt."

Sergeant Boone of the Police Force, knew the locality for 35 years. He said, "the character of the soil is ashes, rubbish, paper, etc." He said he was present when the bodies were drawn out, and he smelled a foul odor, part like garbage but not like dead animals or rotten eggs or anything of that sort."

Officer Warner of the Police Force, who was also present when the bodies were removed, said that he smelled a bad odor, but did not know what it was; that it smelled like a dump, just the same as a dump smells when there is something burning on it.

Amos Albaugh testified that he had known the locality for thirty-five years and that it was a dumping ground; that "the soil was principally ashes, a fill of ashes."

Mr. Theobald, Inspector of the Storm Water Division of the Sewerage Commission, who constructed a trap manhole right beside this opening in July, 1908, said, "the soil was almost entirely ashes," and when asked if there was any garbage or ordinary dumping, said: "It looked like ordinary dumpage." He also testified that he had been engaged in work of that character for fifteen years previous, and that during that period he had only twice worked in soil of the character under consideration; once in the construction of the manhole just mentioned, and again at the Mount Royal Pumping Station, where the soil was composed of "ashes, old shoes, tin cans and glass." He did not state when this last work was done, but presumably after this accident, since that occurred September 19th, 1907, and he stated that he was not with the Sewerage Commission until about September 1st, 1907, and that work was done for the Commission.

Dr. Penniman, an analytical chemist, and Mr. Ezra B. Whitman, a specialist in chemistry and biological analyst of water fluids testified that the decomposition of garbage, *containing vegetable matter,* when in contact with air, produces carbon dioxide, commonly known as carbonic acid gas which will not support combustion, is much heavier than air, and sinks to the lowest accessible level, and when present in quantities ranging from three to ten per cent. the atmosphere is fatal or dangerous to human life.

Dr. Penniman testified that he had no personal experience whatever as to earth gases in made ground, and that his experience was from reading upon the composition of air; that he was familiar with the gases given out by the decomposi-

tion of vegetable matter ordinarily found in garbage, but that if he were told "a large amount of garbage, including vegetable matter, ashes, and cinders had been dumped in a certain place for six or seven years," he could not say positively what gases would be formed, and don't think any one else could from that description; he could only say what he would expect."

Mr. Whitman said he had occasion to study the effect of decomposed garbage and the chemical changes that took place, for the City of Roanoke, Virginia, but his knowledge was derived from reading authorities only and not from personal experience or observation, and that the authorities agree that the principal gas emanating from decaying garbage is carbon dioxide. He also said that the carbonacious matter in garbage would be more rapidly reduced when the soil was exposed to the air by being opened, than if the soil were undisturbed.

Mr. Charles E. Phelps, Chief Engineer of the Electrical Commission of Baltimore, said he had considerable experience in the excavation of underground conduits in the City of Baltimore, though not in the suburbs, and that he had some observation of the effect of carbon dioxide upon workmen, or of such gases as are somtimes formed in excavations. Being asked if he had ever had occasion to provide for taking care of carbon dioxide in the excavations made under his direction in the city, he replied: "Using the term *gas* to include all of those gases found in such excavations, I would have to divide the answer into two parts, one covering the work after it is completed as represented by a manhole in the street, to which I answer: Yes; the other part, to the actual construction, I answer, No."

The above is a condensation of all the testimony *admitted* for the plaintiff.

Edward L. Flanigan, one of the defendants testified that he was present at the work there every day except Sunday until the day of the accident, and was there at four o'clock the afternoon before the accident; that he never observed any gas in the pit and there was no complaint of it from any of

the men at work, and that he had no reason to suspect its presence there; that they had previously made excavations in similar soil on numerous occasions, and never knew or heard of the presence of gas in them, and he named five different places within the city limits where they had excavated to the depth of twenty feet, where the land was all filled the same as in this case and the character of the soil thus made identical, and on cross-examination he said he made no provision for removing gas from the pit, as he had no reason to believe there would be any to remove.

Charles Jordan, defendants' foreman testified that the work was in progress September 13th, 14th, 16th, 17th and 18th, every day continuously except Sunday, and they came back to work on the 19th when the accident occurred, and during all that time there was no gas present; that on the afternoon of the 18th, the day before the accident, a workman reported that he felt the culvert with the crowbar, whereupon the witness went into the pit with a lantern which he set down on the ground, and discovered that it was not the top of the culvert, but a stone, which the crowbar had struck, and that he took the lantern down because he could not see well in the bottom of the pit without a light. He also said that he had been defendants' foreman for seventeen years engaged in similar work, and that they covered the pit at night to guard against persons or teams getting into it.

Patrick Flanigan, the other defendant testified that the firm had been doing work of this character for twenty-three years; that he knew the locality which had been a ravine "filled with ashes just the same as numerus fills around town, and that he had many times made even deeper excavations in similar soil. Being asked if this particular locality was used as a garbage dump, he replied: "It was the same as the York road where Gilmore's houses are built, and those at Patterson Park. It is a general dump, the *garbage* taken from it, the garbage is supposed to be collected separately and deposited at other dumps, such as Caroline street and Ridgely street, and this other place on the class, it is known as an *ash dump,*

*not a garbage dump,"* and that "he had no idea gas would be: encountered in such a· ditch as that."

The above summarizes the testimony for the defendants, and we will now briefly summarize the testimony offered for the plaintiff and excluded.

·(1) Semone was asked what he saw in the pit to enable any. one to get out of it.

· (2) Theobald, when testifying about the trap manhole which he constructed in July, 1908, alongside of this pit, was asked if he encountered any gas in the course of that work.

(3) After stating that during the fifteen years he had been engaged in excavating work, he had only encountered gas in two places, he was asked if he encountered gas at the Mount Royal excavation which he had already testified he made in similar soil, plaintiff's counsel stating they proposed to show that contractors meet with such conditions and provide for them.

(4) The same witness was further asked, "do you yourself take means to eliminate such gases as are met with in similar places" and can you tell what is generally done by others in that line of work?"

(5) The same witness was then asked "can you say as the result of your experience in the two places mentioned what the effect of such gases is upon the human system?"

. (6) The same witness was further asked what, apart from his observation, he had heard that enabled him to say what would be done by others in his line of work.

· (7) Mr. Penniman was asked, assuming that this excavation was made "in soil composed of ashes, cinders, garbage refuse and debris deposited by garbage collectors to fill up the land," whether there would be likely to be found there any definite chemical gases, and if so, what? This was objected to, and he was then asked if his experience and knowledge of chemistry was such as to qualify him to answer the previous question, which was also objected to. The witness replied he had no personal experience at all in the formation

of gases in the earth, or in a pit dug in the earth, but was derived from reading upon the composition of air, and the Court then sustained the objection to both questions.

(8) This witness, after stating he was familiar with gases given out in vegetable decomposition, was asked to state what he would *expect* (as the result of his knowledge), as to the formation of gas in such soil as it was testified there was where this excavation was made.

(9) The same witness was then asked, given the character of soil and excavation testified to for plaintiff, where carbon dioxide might be found, where would such gas accumulate.

(10) Mr. Whitman was asked whether in a garbage dump 25 feet deep the decomposition producing carbon dioxide progresses uniformly throughout, or more rapidly in one part than in another.

(11) He was then asked whether in such a dump the decomposition would be completed throughout in six or seven years, or so far completed as no longer to give off carbon dioxide.

(12) He was further asked whether of his own knowledge there was any way, and if so, what, to disperse such gas in such a pit.

(13) Mr. Phelps, after stating, as heretofore shown, that he had no experience as to the formation of gases during actual excavation in course of construction, but only in the electrical conduits completed and in use, was asked whether there was "any effective way of dispersing or preventing the accumulation of dioxide gas in dangerous quantities in excavation work."

(14) And lastly (referring to the witness' previous statement that he spoke of gas as including all gases found in excavations such as he had charge of), he was asked the same question "as to *any* gases emanating from the soil in excavation work."

As to the first exception, the proffered evidence was clearly inadmissible under the pleadings. The declaration did not count on negligence in failing to supply safe egress from the

pit, but only in not anticipating the presence of gas and in failing to warn Joyce of the danger, and the defendant had the right to have the evidence confined to the issue made by the pleadings. *City Pass. R. W. v. Nugent,* 86 Md. 360; *Merchants & Miners Trans. Co. v. Hazleton,* 108 Md. 567.

As to the second exception, the pit dug by Theobald close to the place of the accident was dug ten months later. Evidence that he found gas there was not admissible as tending to impute knowledge or means of knowledge to the defendants ten months before; and it was irrelevant also because what may have been done ten months later to discover or disperse gas found there would not tend to prove what should have been done ten months earlier. If any inference were to be drawn from the latter case, it would be that any precautions then taken were the result of experience derived from the former case.

As to the third exception the ground of the ruling stated by the Court was that two such experiences as the witness gave could not qualify him as an expert.

In *Harris* v. *Consolidation Coal Co., ante,* page 209, JUDGE BURKE said: "How much knowledge a witness must possess before a party is entitled to his opinion as an expert must be left largely to the discretion of the trial Court, and its rulings thereon will not be disturbed unless clearly erroneous;" and we think the Court committed no error in the exercise of that discretion.

As to the fourth exception the question improperly assumed that gases emanated from the soil of the character at that place, of which there was no proof. The only evidence was that there was a gas in the pit at the time of the accident, but as to whence it came the evidence was silent. The question was objectionable, therefore, for that reason, and also for the same reason which applies to the third exception.

As to the fifth exception the question was answered, and the answer was not stricken out, though the objection was properly sustained. But it was not a proper question, because the knowledge and practice of contractors, *after* the experience

resulting from the accident to Joyce, could throw no light upon what was or should have been their knowledge and practice before that accident, and it appeared from a later answer of this witness that his knowledge of what was then done by contractors was derived from a single isolated observation, at a time not stated, and from what he had *heard,* neither of which would enable him to testify to any general practice in this regard.

As to the sixth exception it is sufficient to say that it asked for bald hearsay.

As to the seventh exception the witness clearly disqualified himself from answering as an expert when he stated he had no experience as to the presence of gases in made ground or in a pit. "An expert must be qualified by experience as well as by knowledge of theory." *Citizens Gas Light Co.* v. *O'Brien,* 15 Bradwell (Ill.), 400; *Harris* v. *Consolidation Coal Co., supra.*

As to the eighth exception, the question assumes that the garbage included *vegetable matter.* The only evidence upon that point was given by Flanigan, who said that the garbage was supposed to be collected separately and deposited at other dumps, and that this place was an ash dump and not a garbage dump. But, apart from this, the answer showed the witness could only say what he would *expect* as to the formation of gas under the circumstances. "But a tribunal which is called on to decide a definite issue of fact cannot be aided where no mental certainty is shown by a witness." 17 *Cyc.* 226.

As to the ninth exception the question makes the same erroneous assumption of fact as in the preceding exception. Moreover, the only answer sought was as to the tendency of carbonic acid gas to accumulate in the lower stratum of air. This had already been answered by Dr. Penniman, and after such answer the jurors were as competent as the expert to draw the inference sought.

As to the tenth exception, Mr. Whitman testified on cross-examination that he had never noted the effect of air on gar-

bage or ever made any tests of any kind to determine how
long it takes garbage to decompose, and in the absence of such
knowledge he was not qualified to answer the question, and
what we have here said disposes also of the eleventh excep-
tion.

As to the twelfth exception, the question should have been
directed to the means known of dispersing carbonic acid gas
in such a pit, at the time this accident occurred, and not at
the time of the trial eighteen months later, and moreover the
witness said later, he never had any practical experience in
getting this gas out of a pit, and all he knew was that, "if you
stir air in there it will move," upon which the trial Judge ob-
served: "You don't know any more than all of us in that."

As to the thirteenth exception, Mr. Phelps, in his careful
and discriminating answer, clearly disqualified himself as an
expert so far as that question is concerned, because he said
his only knowledge or experience with gas was in manholes
for electrical conduits, and not in actual construction of ex-
cavation work. The same means which might be found ef-
fective to prevent accumulation in the former case, or to dis-
perse it, might be totally ineffective in the latter.

We have thus, perhaps at unnecessary length, considered
the numerous exceptions to the evidence in detail, and will
now consider the prayer which was granted.

This prayer asserts that under the pleadings in the case,
there is no evidence legally sufficient to entitle the plaintiff to
recover, and the first inquiry therefore must be what was in
issue under the pleadings, *i. e.,* what was the specific negli-
gence charged on one side and denied on the other. The dec-
laration avers that the plaintiff's death was caused by certain
noxious gases accumulated in the pit into which he descended
by direction of the defendants, and of this there is ample
proof. But that is not the *ground* of the action. The ground
is that the defendants knew, or ought to have known by the
exercise of ordinary care, of the presence of such gases in this
pit; whereas Joyce had no such knowledge or means of knowl-
edge; and that the defendants negligently failed to ascertain

the presence of this gas, or to remove the same before sending Joyce into the pit, and negligently failed to warn him of the danger of encountering the gas. The proof is uncontradicted that the defendants did not *in fact* know of the presence of such gas. They both so testify, and no one asserts the contrary. Jordan's testimony is that only the evening before the accident he took a lighted lantern to the bottom of the pit to enable him to see whether the excavation had reached the arch of the sewer. If such a poisonous gas had then been present, a gas which the experts said would not support combustion, its presence would have been at once discovered. The negligence charged is therefore reduced to the failure to discover its presence on the morning of the accident before Joyce entered the pit, for if there was no negligence in failing to discover its presence, there could be none in failing to remove it, or in failing to warn Joyce of the danger of encountering it. In order therefore to test the correctness of the ruling on this prayer, we have only to ascertain first whether the defendants could by the exercise of ordinary care have known of the presence of this gas, and if they could, then whether Joyce, in the exercise of ordinary care, could also have known it, for if so the plaintiff could not then recover.

There is absolutely no evidence of the existence in the soil where this excavation was made, of any organic matter, animal or vegetable, to develop dangerous gas when brought in contract with the air, and the term *garbage* does not necessarily imply the presence of such organic matter. In 4 *Words and Phrases,* p. , the definition of the *Century Dictionary* is adopted, the primary meaning being "refuse organic matter in general," and the secondary meaning being "any worthless or offensive matter." The testimony of Mr. Flanigan. which is uncontradicted, is that this was an ash dump, as distinguished in the practice of the city from a *garbage* dump. This work had been prosecuted continuously from the 13th to the 19th of September, with an exception of the intervening Sunday, the 15th inst., without any sign of the presence of gas, or anything, so far as the testimony

discloses, to indicate that it might be developed. The pit was as deep at the close of work on the 18th as it was on the morning of the 19th, when the presence of gas was first discovered, and the fact that the lantern used at the bottom of the pit the evening of the 18th burned brightly demonstrates absolutely that there was then no gas there, and approaches demonstration that there was nothing exposed in the sides of the pit which could lead the defendants, in the exercise of ordinary care, to anticipate the formation of gas. There is no evidence that there was any established or general custom among those engaged in work of that character in or about the city to take precautions for the discovery of gas, which the defendants might have taken but neglected to take, and even if the evidence offered and excluded had all been admitted, it would not have established such a custom, and we should still be compelled to consider the prayer granted in the same light in which we are now considering it.

The argument of the appellant, when carefully analyzed, *seems* to go to the extent of requiring the master to *insure* the servant a safe place in which to perform his work, though it is not expressly so declared. The case principally relied on by the appellant, *Degenais* v. *Houle,* Quebec Official Law Reports, Vol. 11, page 225, is very similar to the case at bar, and if adopted here would unsettle all our decisions and those of our sister States as to the standard of care required of masters towards servants. The opinion in that case is in French, but counsel have translated the important passages for our benefit. The Court there says: "The contractor is bound to know the *rules of his trade,* and particularly the dangers which might be presented in the digging of trenches in *every kind of ground,* and to take what measures might be necessary to prevent accidents such as happened on this occasion. *He is at fault in undertaking things which are beyond his powers or his knowledge, and he is responsible for damages caused either by failure to adopt the precautions required by the rules of his profession or art, or by those of simple human prudence.*"

We are not to be understood that defendants would be held blameless if there was evidence that in the prosecution of this work they had neglected precautions required by the *rules of the trade,* or even in the absence of such rules, if there were evidence of any conditions in the soil which should have excited apprehensions in the mind of ordinarily careful and prudent men of any impending danger. But we cannot without disregarding our own decisions require of them the same standard of care required of scientific experts.

It is sometimes inadvertently said that the master is bound to furnish his servant a safe place in which to work, but this is inaccurate and misleading. He is bound in so far as that he cannot delegate that duty to another, but he is only bound "to exercise *reasonable care* in providing a reasonably safe place to do the work required of his servant; that is, to guard him against probable, but not *possible* danger. * * * He is not expected to be omniscient; hence the rule that he is not to be held as the insurer of the safety of the servant." *Lawless* v. *Laclede Gas Light Co.,* 72 Mo. Appeals, citing *Pollock on Torts,* page 45.

The true rule has been nowhere better stated than in *Titus* v. *Bradford R. R.,* 136 Pa. 626, in which the Court said: "Absolute safety is unattainable, and employers are not insurers. They are liable for the consequences *not of danger, but of negligence,* and the unbending test of negligence in *methods,* machinery, and appliances, is the *ordinary usage of the business.* No man is held by law to a higher degree of skill than the fair average of his profession or trade, and the standard of due care is the standard of the average prudent man. The test of negligence in employers is the same, and however strongly they may be convinced there is a better and less dangerous way, no jury can be permitted to say that the usual and ordinary way commonly adopted by those in the same business, is a negligent way."

One or two citations will serve to illustrate the application of this rule.

In *Siegel* v. *Electric Co.,* 143 Mich. 484, the injury re-

sulted from an explosion of fumes from varnish which a servant was putting on by the light of a lantern. The Court held that "a master using varnishes in his business is not required to warn his servants of dangers attending their use that are within the knowledge only of persons having the knowledge of skilled chemists; to require more than the knowledge possessed by the ordinarily well informed user of varnishes, would be to require more than ordinary care."

In *Kelly* v. *Forty Second St. R. W.*, 58 Hun. 93, it was said: "What the law exacts from the employer is the exercise of reasonable care and intelligence for the protection and safety of the persons employed. And when that is observed, the happening of what is at most only a possible accident, is part of the risk of the employment."

In *Gans Salvage Co.* v. *Byrnes*, 102 Md. 230, the declaration alleged that the plaintiff was put to work upon the wall of a burned building which was unsafe to work on or near, and that this dangerous condition was known to the defendant, but unknown to the plaintiff who was injured while using due care. There was a verdict for the plaintiff, and in reversing the judgment on appeal without awarding a new trial, JUDGE McSHERRY said: "It was incumbent on the appellee under the declaration to prove by legally sufficient evidence * * * that the identical wall which by falling caused the injury complained of, was in a dangerous condition when the appellee was put to work in close proximity to it; that the appellant had knowledge of this dangerous condition prior to the occurrence of the accident; and that the appellee was ignorant of the danger and could not have discovered it by the exercise of proper prudence and care." And he said further, "no inference as to the dangerous condition of the walls can be drawn from the mere fact that they fell, unless it be assumed they could not have fallen had they not been in an unsafe condition. But to assume that would be to assume as true the precise thing to be proved, and that assumption when adopted would then be substituted for evidence tending to establish the fact to be proved. Such a process would per-

mit negligence to be inferred from the simple happening of the accident. In a case like this that cannot be done."

It is obvious that the allusion in the last sentence is to cases of injuries to passengers in the charge of common carriers who are in such cases held to the highest degree of care and human skill; and even in those cases, the bare fact that an injury has happened, of itself, and apart from all surrounding circumstances, cannot authorize an inference that it was caused by negligence. If it was caused by a collision with other cars of the same carrier, or by some other "abnormal condition in the department of actual transportation" the presumption of negligence in such case will arise. *Benedick v. Potts,* 88 Md. 57.

So here, no inference of reasonable ground to suspect the formation of gas in this pit can be drawn from the fact that it was suddenly discovered after six days work in the pit unless it be assumed it would not have appeared, if there had not been some rational and practical ground to suspect its formation. But to assume this would be to assume the thing to be proved, and to do so without a particle of evidence to sustain the assumption. The toll of human life exacted by modern methods and machinery in such varied and dangerous undertakings is frightful to consider, and it is a sad fact that a vast majority of those who suffer therefrom are the wives and children of laborers dependent upon them for support, but the Courts are powerless to relieve this situation. As was said in *Allison Mfg. Co.* v. *McCormick,* 118 Pa. 519, we can only say here: "Her case is a sad one, but her right to recover must rest upon a legal liability of the employer or her action must fail."

*Judgment affirmed with costs to the appellees above and below.*