ADAMS v. GRAND RAPIDS REFRIGERATOR CO.

1. MASTER AND SERVANT — DUTY TO WARN AND INSTRUCT — EXPLOSIONS FROM CONTACT OF MOLTEN MATTER AND WATER.

An employer engaged in the manufacture of enamel, which is brought in contact with water while it is in a molten condition, is under an obligation to acquaint an employé subject to risk, with the danger of explosion which is ascertainable from a knowledge of scientific principles, with which some one in the business should be acquainted.

2. SAME—QUESTIONS OF LAW AND FACT—DIRECTING VERDICT.

The question of the master's duty to warn his servant is for

the jury in a case where an explosion occurred from the use of insufficient water in a tank employed to receive molten enamel.

3. SAME—ASSUMED RISK—CHEMICAL AND PHYSICAL LAWS.

The employé is not presumed to possess such scientific knowledge as to charge him with the assumption of risk from an explosion of the enamel, without a previous warning of the danger.[1]

Error to Kent; McDonald, J. Submitted December 14, 1909. (Docket No. 113.) Decided April 1, 1910.

Case by Harry Adams against the Grand Rapids Refrigerator Company for personal injuries. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*Taggart, Denison & Wilson* and *Kleinhans & Knappen*, for appellant.

*Lombard & Hext*, for appellee.

MONTGOMERY, C. J. The defendant is engaged in the manufacture of porcelain-lined refrigerators, and as a part of its operations manufactures its own porcelain. Plaintiff, who was at the time 34 years of age, suffered an injury by an explosion occurring in the tank into which the enamel is drawn off after being smelted, on the 27th day of November, 1906. He at that time had been employed by the defendant about four years in its enameling department.

The ingredients of the enamel comprise, among other things, oxides of silicon, sodium, potassium, calcium, and metal oxides as a basis, with fluorine as a flux. In preparing the enamel, the first step is the thorough mixing of the ingredients, which have first been ground to a fine powder. This mixture is then placed in the smelter and subjected to a high temperature until fusion results. It is then drawn off in its molten state into a tank of water

---

[1]As to what knowledge of scientific facts is imputed to servants, see note to *James v. Rapides Lumber Co.* (La.), 44 L. R. A. 75.

where it breaks up into granular form, resembling small particles of semi-opaque glass, in which form it is called the "frit." This frit is then reground with other non-fusible materials to render the ultimate porcelain opaque. The furnace in which this material was melted consisted of a fire pot and two melting pots, in which was placed the material for smelting. The pot itself is about two feet in diameter and about one foot deep. It is constructed of fire brick laid in courses inside the iron or steel shell of the furnace. In the front and at the bottom of this melting pot is a spout through which this molten enamel is drawn from the tank. This spout runs from the outer casing backwards and upwards into the pot about three or four inches, which brings its inner end ordinarily about three inches from the inside of the fire brick. Before the ground enamel is put into the pot for smelting, this spout is plugged up with German clay. Directly above each melting pot, and in the top of the furnace, is also another door or aperture through which the ground enamel for smelting is put into the pot. Underneath each of the pots is a tank eight feet long, two feet deep, and two feet four inches wide. These tanks extend through under the pots, and can be moved backward and forward like a drawer, arranged on little wheels. When the enamel is ready to be drawn off, the tank is pulled out from in under the pot and partially filled with water from a spigot fixed beside it for that purpose. In ordinary use it was customary to have this tank nearly two-thirds full.

On the day in question, as the testimony of the plaintiff tends to show, the work had been practically completed, and he started to draw off a quantity of the enamel somewhat less than the ordinary batch. With a small batch less water is said to be necessary, and was so thought by the plaintiff. He was directed by the foreman, as he testifies, when to open up the spout and to allow the enamel to flow. He started to do so, with the tank only about one-third full of water. A terrific explosion occurred, blowing the sides and the ends of the tank out, and the plaintiff

was severely injured. He recovered a verdict at the hands of the jury, and the case is brought here for review.

The only ground of error urged is that the circuit judge erred in failing to take the case from the jury. Defendant's counsel assert that the only basic proposition of law to be considered is this: Was there any duty on the part of the defendant to warn plaintiff of the danger of an explosion of the extent and character which injured the plaintiff? Defendant's contention is that the cause is entirely problematical, that no such accident had ever before occurred, and that plaintiff was chargeable with at least as great a knowledge as defendant of the liability of such unexplained accident to occur.

The testimony bearing upon the question of defendant's duty was on its behalf that of an expert witness, who, among other things, testified that in all the history of the art—and he had been engaged in the sale of furnaces such as were used by the defendant for years—no similar accident had occurred. The plaintiff's case was supported by the testimony of an expert, who gave testimony tending to show that a highly heated or molten mass coming in contact with a small quantity of water may cause, and is likely to result in, an explosion. Dr. Lyman, who had been a chemist for many years, testified as to the cause of the explosion as follows:

"The probable cause—there are two possible explanations of an explosion occurring under like circumstances—the probable cause was the instantaneous conversion of a certain volume of water into steam by the excessive heat which is necessary to render the constituents of porcelain a molten or fluid mass."

This he elaborated, and the testimony further showed that the heat applied to this substance was very great, being 2,750 degrees.

The question is whether this scientific fact was one of which the defendants should have had knowledge, and

160 MICH.—38.

should have made the plaintiff acquainted with. The case presents an entirely different question from that in *Siegel* v. *Heating Co.*, 143 Mich. 484 (106 N. W. 1127), in which it appeared that an explosion occurred from a volatile solvent drawn off from a varnish purchased by the defendant for use in its business. It was held in that case that the defendant was not negligent unless it knew, or should have known, of the danger to which plaintiff's employment exposed him. In answering the question, Does the testimony warrant the inference that the defendant should have known it? the court said:

"In determining this question, it should be borne in mind that defendant did not manufacture this varnish. Defendant purchased the varnish for the purpose of using it to gild radiators."

This was clearly an important fact in the case, as the well-recognized obligation of the defendant in such circumstances would be to use reasonable caution in purchasing of a reputable dealer. In the present case, however, the defendant was employing in its business substances and processes of which some one must have had or should have had some scientific knowledge. That an obligation rests upon an employer to acquaint an employé with the dangers which can be ascertained by a knowledge of scientific principles, and to which he would be in his ignorance otherwise subjected, is a recognized doctrine of the law.

In 1 Labatt on Master and Servant, pp. 298–301, the writer states that the master is bound to—

"Take into account the properties of such substances as he employs for the purposes of his business, and the operation of familiar physical laws upon these substances. * * * Under this head he is chargeable with knowledge of the following facts: * * * That the contact of water with molten metal or other substance which is heated to a sufficiently high temperature will generate steam suddenly, and so cause an explosion; that certain inflammable substances will ignite under certain circumstances; that special precautions must be taken where the

business involves the production or use of things of the imminently dangerous class, such as an explosive, or a current of electricity."

This view is also supported by our own decisions, the leading case being the case of *Smith* v. *Car Works*, 60 Mich. 501 (27 N. W. 662, 1 Am. St. Rep. 542). See, also, *Ribich* v. *Smelting Co.*, 123 Mich. 401 (82 N. W. 279, 48 L. R. A. 649, 81 Am. St. Rep. 215). It is further stated by the same author (page 302):

" For injuries caused by his failure to foresee the results of the operation of the natural laws which he is presumed to comprehend, the master is liable, even though such results may be of an unusual character."

The natural law which plaintiff's testimony tended to show would result in the explosion in the present case was one which, while well recognized, might not indicate great imminence of danger except under peculiar conditions, namely, permitting this molten matter to flow into a comparatively small quantity of water. But the consequences of the operation of this natural law under these somewhat unusual conditions were so great as to suggest to any prudent man the necessity of informing one likely to be injuriously affected by a want of knowledge of such a natural law. In the present case, it is extremely improbable that this accident would have occurred had the tank been full or nearly full. It was the contact of the molten matter with a quantity of water less than the usual amount which caused the unusual result, and yet this was something that was liable to happen either by an error of judgment or by accident in any day's operation of the smelter. We think, therefore, it was a question for the jury on the proof as to whether this was a natural law which should have been understood by the defendant and communicated to the plaintiff. See, in addition to the cases cited from our own State, *Tissue* v. *Railroad Co.*, 112 Pa. 91 (3 Atl. 667, 56 Am. Rep. 310); *McGowan* v. *Smelting Co.*, 9 Fed. 861; *Holland* v. *Railroad Co.*, 91 Ala. 444 (8 South. 524, 12 L. R. A. 232).

It is contended, however, that the plaintiff had the same means of knowledge that the defendant possessed. We think the cases cited support the view that one employed as a workman is not supposed to possess such scientific knowledge of chemical changes or of such extraordinary results of the action of the forces commonly used in the business as those shown in this case. In *Holland* v. *Railroad Co.*, above cited, it was said:

"The other peril arose from the fact, supported by a tendency of the evidence here, that a 'boil' of iron upon being punctured, and having its shell broken, bursts, and throws out molten metal in all directions—'explodes,' as some of the witnesses stated as to this one, though this term was said to be inapt and inaccurate by others. Of this peril—the danger of the flying molten iron—resulting from unseen and unappreciated conditions and forces, the inexperienced man would know nothing by the exercise of his senses. It was a state of things which would not address itself to his comprehension, and of which he could only come to a knowledge by being instructed in regard to it."

And in the case of *McGowan* v. *Smelting Co.*, above cited, the court said:

"The explosive power of hot slag when cast into water is not within the intelligence of ordinary men. It is doubtful whether many people of education know the force and violence of such an explosion; and, if fully informed, how many of them, when put into service at a smelting furnace, would recall their learning without a suggestion from some source?"

We think it cannot be said as a matter of law that the plaintiff should be presumed to have had the scientific knowledge which the law requires of the defendant in such a case.

There was no error committed in submitting this case to the jury, and, as this is the only question presented, the judgment will be affirmed.

OSTRANDER, HOOKER, MOORE, and McALVAY, JJ., concurred.