## Peaslee-Gaulbert Company v. McMath's Admr.
(Decided May 9, 1912.)
### Appeal from Christian Circuit Court.

1. Tort—Venue of Action For—Construction of Code.—Under section 72 of the Civil Code providing that an action in tort against a corporation must be brought in the county in which its office or place of business is situated, or in the county in which the tort was committed, the action may be brought in the county in which the injury complained of actually occurred, although that may not be the county in which the negligence that is the basis of the action had its origin.

2. Tort—Venue of Action for.—Where an action was brought against a corporation that had its home office in Jefferson county, to recover damages growing out of its failure to label a dangerous article that it sold and delivered to the purchaser in Jefferson county, the Christian Circuit Court had jurisdiction of the action, as it was in that county that the injury complained of occurred, although the negligence in failing to properly label the article occurred in Jefferson county.

3. Explosives—Liability of Dealer for Selling, Without Attaching Danger Label.—A dealer who in the ordinary course of business buys an article that is dangerous if not used with care, is not liable to a third party injured in its use for his failure in selling it to put a danger or caution sign on it, unless he knows that the article is dangerous, or misrepresents its qualities, or practices some fraud or concealment in its sale.

4. Explosives—Liability of Dealer for Failing to Attach Danger Sign.—A dealer who buys an article in the open market, that is in general and common use, is not liable to a third party injured by its use for his failure to attach a danger sign before selling it, although he might have discovered its dangerous qualities by the exercise of ordinary care, as knowledge of its dangerous qualities must be brought home to the dealer before liability attaches.

SELDEN Y. TRIMBLE, TRABUE, DOOLAN & COX and TRIMBLE & BELL for appellant.

HUNTER WOOD & SON and C. H. BUSH for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

Herbert McMath, an experienced house painter, was killed in Christian county, Kentucky, by the explosion of a can of "No. 1, T. Japan Dryer." His administrator brought this action against Peaslee-Gaulbert Company, wholesale dealers in paints and varnishes who sold the dryer to Whitlow & Sons, for whom McMath worked, and recovered judgment for $5,000.00.

Before taking up the merits of the case, we will dispose of the question of jurisdiction raised by counsel for appellant in the lower court and in this. The action was brought in Christian county, Kentucky, and the summons served on an officer of the appellant company in Jefferson county, Kentucky, at which place is located its home office and chief place of business. Whitlow & Sons were merchants doing business in Christian county, Kentucky, and they gave an order at their place of business in Christian county to a traveling salesman for Peaslee-Gaulbert Company for the Japan dryer. This salesman only had authority to take orders for goods, and send them to the home office of the Peaslee-Gaulbert Company, at which place they were accepted or rejected by the company. The order sent by the salesman was accepted by the company, and the goods were shipped F. O. B., Louisville, Kentucky, to Whitlow & Sons, who paid the freight.

The basis of the cause of action, which sounded in tort, was the failure of Peaslee-Gaulbert Company to put a danger or caution mark, sign or label on the can of Japan Dryer. It was shipped without anything indicating its contents, except an attached tag showing that the can contained "No. 1 T. Japan Dryer."

It is insisted for appellant that under these facts the circuit court of Christian county had no jurisdiction of the cause of action, and that it should have been brought in Jefferson county.

Section 72 of the Civil Code which fixes the venue of the action provides in part that:

" * * * an action against a corporation which has an office or place of business in this State, or a chief officer or agent residing in this State, must be brought in the county in which such office or place of business is situated or in which such officer or agent resides; or, if it be upon a contract, in the above named county, or in the county in which the contract is made or to be per-

formed; or, if it be for a tort, in the first named county, or the county in which the tort is committed."

Under this section, an action for tort may be brought against a corporation which has an office or place of business in this State, or chief officer or agent residing in this State, in the county in which such office or place of business is situated or in which such officer or agent resides, or in the county in which the tort is committed. It is of course conceded that the action might have been brought in Jefferson county; and if the tort complained of was committed in Christian county, it is obvious that the Christian Circuit Court had jurisdiction of the action. This being so, the precise question for decision is, was the tort committed in Christian county, as the only ground upon which it is claimed that the Christian Circuit Court had jurisdiction is the fact that the tort was committed in that county. Assuming that the failure to put a danger or caution mark on the can containing this dryer was actionable, it is the contention of counsel for the appellant that the tort was committed in Jefferson county, at which place the dryer was sold by the appellant company and delivered as the property of Whitlow & Sons to a common carrier for shipment to their place of business. On the other hand, it is insisted by counsel for appellee that although the cause of action was based upon the failure to put a danger or caution mark on the can containing the dryer, that the tort in the meaning of the Code was committed in the county where the injury resulting from this failure occurred.

A good deal is said in argument concerning the place where the Japan dryer was sold—one side insisting that the sale took place in Jefferson county, the other that it took place in Christian County. But, we do not deem it important or necessary in disposing of the question to enter into a discussion of the place where the sale took place. We will assume that the sale was made in Louisville at which place the order was accepted and the goods delivered to a common carrier to be transported at the risk of the consignees to their place of business. If there had been no explosion, no person could have maintained an action against the appellant company for selling and sending out this article without a caution or danger sign attached to it. In other words, no actionable tort would have been committed either in Jefferson county or in Christian county. It is the fact that the explosion occurred with resulting injury that furnished

the basis for the cause of action. The thing that gave life to the cause of action occurred in Christian county, where the accident happened; and, so, it would naturally seem that in Christian county, if at all, the tort complained of was committed.

It is said, however, that as the failure to put the caution or danger sign on the can is the sole ground upon which the action rests, that this negligence or tort on the part of the appellant company was necessarily committed in Jefferson county. Undoubtedly, if appellant company was guilty of negligence or tort in this respect, it was committed in that county; but, conceding this much, it does not follow that that county was the only county in which the tort was committed or the negligence done. The negligence and wrong-doing, if any, had its beginning in Jefferson county; but it was, if anything, a continuing act of negligence or wrong-doing, for which an action might be brought in any county in which injury resulted therefrom, and the cause of action did not arise until some person suffered injury or loss by reason of the wrongful act. As no actionable tort could have been committed until either person or property was injured, it seems quite clear that if the words of the Code are to be given their reasonable meaning, the venue of the action was in the county where the tort was in fact committed by the infliction of injury, as well as in the county where the tort-feasor resided. There may be a continuing species of wrong-doing that only becomes actionable when injury results therefrom, and, in such a state of case, we know of no reason why the venue of the action should not lie in the county where the overt act of wrong-doing, if we may so term it, is committed. A tort is nothing more than an injury or wrong for which a civil action may be brought by the injured party against the wrong-doer, and to give full effect to the Code provision that the action to recover damages may be brought in the county where the tort was committed, it should be construed to mean that it may be brought in that county in which the injury or wrong complained of was committed. To give to this section the construction contended for by appellant would in many instances confine the jurisdiction to the county of the defendant's residence, when it was intended that it might also be brought in the county where the person or property was in fact injured, which is usually the county of the residence of the complaining party. If it had been intended to limit the jurisdic-

tion to the county in which the corporation resided or had its chief office, there would have been no reason for inserting the provision that the action might also be brought in the county where the tort was committed; and, as in the present case, the tort could not have been committed in any other county than that in which the injury complained of occurred, we have no doubt that the Christian Circuit Court had jurisdiction.

A case strongly supporting this construction of the Code is Mitchell v. Ripy, 82 Ky., 516. In that case it appears that an action was brought in Marion county by Mitchell against Ripy, Cohen and Edwards, to recover damages for false imprisonment. The affidavit upon which Mitchell was arrested was made by Edwards in Anderson county, and a warrant of arrest was issued against Mitchell in that county and returned "not found." Thereupon, it was sent to Marion county, where Mitchell was arrested and brought to Anderson county, and acquitted of the charge. Section 74 of the Code, which regulated the venue of the action in that case, provides that, "every other action for an injury to the person of the plaintiff, and every action for an injury to the character of the plaintiff, against a person residing in this State, must be brought in the county in which the defendant resides, or in which the injury is done." In holding that the Marion court had jurisdiction, the Court said:

"As all the defendants resided in the county of Anderson, when the action was brought, the jurisdiction of the Marion Circuit Court depends upon the meaning of the words 'in which the injury was done.' In determining this question the first and most natural inquiry that arises is, for what injury to the person of the plaintiff was this action brought? The affidavit was made and the warrant for the arrest was issued in the county of Anderson. But it is clear that if nothing more had been done, the plaintiff could not have maintained this action in any court. The personal injury of which the plaintiff complains, and for which this action was brought, is his arrest and imprisonment. That was accomplished—done in Marion county. The action is against defendants, who, it is alleged, maliciously and without probable cause procured the warrant of arrest to issue, by means of which the injury complained of was done; and, in our opinion, the jurisdiction of such an action is, in the meaning of the Code, no more determined by the county

in which the criminal law may be wrongfully put in motion, than it is controlled in an action for assault and battery, by the place where a conspiracy may be hatched to accomplish the beating or wounding.    Necessarily, every injury to  the person,  accompanied  with force, must be done at the place where the person is at the time of the injury.'' See also Alabama Great Southern R. Co. v. Carroll, 97 Ala., 125; 38 Am. St. Rep., 163; Chicago R. Co. v. Doyle, 60 Miss., 977; Smith v. Southern Ry. 136 Ky., 162.

The cases of Commonwealth v. Grand Central Bldg., & L. Assn., 97 Ky., 325, and Commonwealth v. Remington Typewriter Co., 127 Ky., 177, relied on by counsel for appellant, are not in conflict with the views we have expressed. The question of jurisdiction raised  in  these cases came up under a statute very different from section 72 of the Code, and under a statute intended to meet very different conditions from the Code provision.

On the merits of the case, a recovery was sought upon the ground as stated in the petition that there had been shipped by Pleaslee-Gaulbert Company to Whitlow & Sons a supply of paints and oils, including a can of dryer—

"But the  said  can was not labelled, and there was nothing about it to indicate that there was any explosive substance in it and nothing to warn any person that it contained anything of the kind that was dangerous or explosive; and it was not known by the said Whitlow & Sons, or either of them, or plaintiff's intestate, or any one in the employ of the said Whitlow & Sons, so far as the plaintiff knows or believes, that the said can did contain any explosive or dangerous substance.    Plaintiff further states that the said intestate, Herbert McMath, exercised care and caution in handling said dryer, and that he did not know and could not have known by the exercise of ordinary or reasonable care that it was explosive or dangerous.  He further states that the defendant, Peaslee-Gaulbert Company, did know, or could have known by the exercise of ordinary care that said dryer was explosive and dangerous, and also knew that it had to be handled by workmen engaged in painting, and that in shipping and delivering same to the said Whitlow & Sons, knowing that it was purchased to be used in drying paint, and had to be used by the workmen of Whitlow & Sons, without labelling it so as to give notice or warning of its being dangerous, and being an ex-

plosive or containing explosive substances, the said defendant was guilty of gross negligence and by reason of its negligence aforesaid the said Herbert McMath came to his death."

And it is earnestly insisted that although the evidence may not show that Peaslee-Gaulbert Company knew the explosive and dangerous quality of the dryer, they are yet liable if by the exercise of ordinary care they could have known its explosive and dangerous character.

The evidence shows that McMath had been engaged for several years in the business of house-painting. At the time of the accident, he was in the employ of Whitlow & Sons, and went to their place of business after dark for the purpose of getting a small can that he had with him filled with dryer and in company with W. H. Payne went to the wareroom in which Whitlow & Sons kept their paints and varnishes. The room was quite dark, and Payne carried a lighted candle in his hand. When McMath, who was holding the five gallon can of dryer first commenced to pour it into the small can he had brought for the purpose of having filled, Payne held the lighted candle a few feet from the can of dryer; but, discovering that McMath had some difficulty in pouring the dryer into the small can, Payne asked McMath if it was dangerous, and upon his answering "No, not a bit," he put the lighted candle close to the mouth of the can out of which the dryer was being poured, and at once the explosion occurred that resulted in the death of McMath. It is evident that the flame from the candle came in actual contact with the dryer as it was being poured out by McMath, or else so close to it that it caused it to ignite and explode. McMath did not request Payne to hold the candle closer, nor does it appear, except from inference, that he knew how close Payne was holding the candle to the mouth of the can. Payne did not know anything about the danger that would attend contact between the dryer and the lighted candle, nor indeed does it appear that he knew what kind of material McMath was pouring into the can. There was only attached to the can a label with the words "No 1 T. Japan Dryer" on it, and no danger or caution sign or mark on the can, or anything to indicate that it was dangerous to hold a lighted candle near to the liquid when it was being poured out.

It also appears from the evidence that the name "No. 1 T. Japan Dryer" is merely a trade name—having no significance outside of the trade and giving no evidence

of the contents or ingredients of the dryer to persons not familiar with the article. It is a standard dryer, in general use by painters, and is manufactured by a large number of concerns in different parts of the country—there being six firms in Louisville alone that manufacture and sell it. Peaslee-Gaulbert Company, although wholesale dealers in paints and varnishes, had never manufactured this article of trade, but had been buying it for a number of years from the Louisville Varnish Company—a concern that manufactured it, and it was from this company that the can was bought that was sold to Whitlow & Sons.

A number of witnesses who were qualified to testify from experience in its use and who knew the ingredients and qualities of this dryer, said that it was not explosive or dangerous unless brought in contact with a lighted flame. Practically all of them testified that all varnishes were inflammable, and that it was not safe to go with a burning lamp or light into a room where varnishes were kept. That these varnishes, including this dryer, gave off gases that were easily ignited, and that almost any kind of varnish would explode, or at least catch on fire, if brought in contact with a light of any kind. They also testified that this dryer, as well as other varnishes, were not regarded by the trade as dangerous, but that it was necessary to exercise some care in handling and using them to keep a light or flame from coming in contact with the varnishes or the gases that might escape therefrom. It was further shown, without contradiction, by a number of manufacturers and wholesale dealers who made and sold the dryer in question, that no caution or danger sign or tag was ever put on the can or receptacle containing the article. The superintendent of the Louisville Varnish Company testified that he had been making for about fifteen years "No. 1 T. Japan Dryer" from the same formula as that by which the dryer Peaslee-Gaulbert Company sold was made and had been selling it to the trade all over the country, and that his company had never placed any caution or danger sign on it. This witness gave the ingredients of the dryer, which consist among other things of linseed oil, turpentine and naptha. As illustrating the character of evidence, we may take Frank A. Lane, who had many years' experience in the manufacture and use of varnishes, including "No. 1 T. Japan Dryer." He testified that it was a type of standard dryer used by practically every varnish maker

in the business. That it was not considered explosive, but was inflammable and would easily flash and burn if exposed to an open flame, or, if agitated or stirred up in a confined space and then subjected to an open flame that the vapors from the material would cause an explosion, the extent of which would depend entirely upon the amount of gas that had been generated and how close it was confined. That it would not explode or take fire spontaneously, or unless it came in contact with an open flame or a live spark. He also said that it had never been the custom of manufacturers, dealers or handlers of dryer to put caution or danger labels on the packages, indicating any hazard in using or handling them.

In brief, the substance of all the evidence is that this dryer was not explosive, or inflammable, unless brought in contact with a lighted flame, and was not inherently, or imminently dangerous or dangerous at all if handled or used with ordinary care. That "No. 1 T. Japan Dryer" was manufactured substantially by the same formula all over the country and sold to the trade generally as an article of common use in the varnish business. That none of the manufacturers or dealers ever placed on their cans containing this dryer any danger or caution sign or mark or other thing to indicate that care should be used in handling it. It might also be here remarked that there is no statute in this State requiring a danger or caution mark of any kind to be placed on articles like this.

There is no evidence in the record that Peaslee-Gaulbert Company knew that this dryer was explosive or inherently or imminently dangerous, or at all dangerous if used with reasonable care, nor is there any evidence that they had ever heard of any accident caused by its ignition or explosion.

If we should assume that this dryer was an explosive or an inherently or imminently dangerous article of trade, there is no evidence that Peaslee-Gaulbert Company had any knowledge of its dangerous qualities when they sold it to Whitlow & Sons. Nor is there any suggestion that they made any representations or warranties concerning it or concealed from the purchaser any fact in connection with it. It was bought by them on the open market in the ordinary and usual course of business as an article of general and common use all over the country that they and other dealers in paints and varnishes had been buying and selling for many years.

In all their experience and observation no can or recep-
tacle containing it, either bought or sold by them, or
by other dealers, ever had a caution or danger label or
sign on it. They doubtless knew, as would other persons
of ordinary intelligence who were accustomed to the use
of paints and varnishes, that it was dangerous to bring
a lighted flame in contact with varnish or dryer, as it was
a very inflammable article but, so far as the evidence
shows, they had never heard of any person being injured
by its use. Nor is there any evidence that their attention
had ever been directed by any person or by any incident
to the inflammable or explosive quality of this dryer.
Of course, if Peaslee-Gaulbert Company could be made
liable in an action like this so could any other merchant
or dealer to whom they sold the article and who bought
it, and sold it as they did. No difference in respect to
liability can be made between the wholesale dealer and
the retail dealer, or between the merchant who buys
from the manufacturer and the merchant who sells di-
rectly to the consumer. If the conditions and circum-
stances surrounding the purchase and sale are alike, the
measure of responsibilty of all merchants and dealers
is the same. If a dealer or merchant, whether he be a
wholesale dealer or a retail dealer, or the original pur-
chaser of the article, or the person who makes the sale
to the consumer, knows that the article is inherently or
imminently dangerous in the use for which it is intended,
because of its inflammable or explosive qualities, it is
his duty to label or mark the package containing the
article in such a way as to indicate its dangerous con-
tents. But the dealer who purchases and sells an article
in common and general use, in the usual course of trade
and business, without knowledge of its dangerous qual-
ities, is not under a duty to exercise ordinary care to
discover whether it is dangerous or not. He may take
it as he finds it on the market. He is not required to in-
vestigate its qualities or endeavor to ascertain whether
it is dangerous, for the use intended before he can ab-
solve himself from liability in the event injury results
from its use. There are many necessary articles and
things in common and general use throughout the coun-
try that are dangerous unless used with care, but the
dealer who buys and sells them in the open market in
the usual and ordinary course of his business, and who
makes no representations or concealments, and who
does not know that the article is explosive or dangerous

in its ordinary use, is not to be made liable merely because some person is injured or killed while handling it. The merchant or dealer can only be made responsible in damages to a party who has no contractual relations with him when the article is imminently or inherently dangerous in the ordinary use for which it is intended or the use to which it may reasonably be expected the article will be put or applied; and, when with knowledge of this fact he sells or puts it on the market without giving notice to the purchaser of its dangerous quality, or, when he represents the thing as being safe for the use intended, when in fact it is not. As stated in Wellington v. Dunn Kerosene Oil Co., 104 Mass., 64—

"It is well settled that a man who delivers an article which he knows to be dangerous or obnoxious to another person, without notice of its nature and quality, is liable for injury which may reasonably be contemplated to and which in fact does result therefrom to that person or any other who is not himself in fault."

To hold dealers who buy and sell articles that are in general and common use, and that are dangerous only when carelessly or inattentively used, liable in damages for the failure to give notice of their qualities or the danger in their use when the dealer does not know of the danger, would be to impose a greater burden than the protection of the public requires and to put on dealers a higher degree of care in the conduct of their business than they should be expected to bear. But if the dealer knows that the article is inherently or imminently dangerous, or is highly explosive, or if he conceals or misrepresents its qualities, or warrants or represents it to be safe for the use intended, when it is not, there is no reason why he should not be held chargeable with the reasonable and proximate consequences of his act in selling it without notice of the danger in its use.

Questions like this have come before this court, as well as courts of other States, in many cases, but they have generally arisen in actions against manufacturers for selling and putting on the market without proper notice articles that were inherently or imminently dangerous. The authorities are practically agreed that when a manufacturer puts on the market for use without notice of its dangerous quality an article that is imminently or inherently dangerous, he will be liable in damages to any person who while himself in the exercise of ordinary care suffers injury as a result of the

dangerous quality of the article; and the manufacturer as a rule will be charged with notice of the quality of the article that he himself has made, and can not excuse himself upon the ground that he did not know its dangerous qualities. It is not, however, necessary or indeed pertinent to the matter in hand that we should extend this opinion in a discussion of the duty and liability of the manufacturer or the degree of care he must exercise in the sale of his products. Full discussions of these questions may be found in the cases of Clement v. Crossby & Co., 148 Mich., 293; 10 L. R. A., n. s. 588, 12 Am. & Eng. Anno. Cases, 265; Thomas v. Winchester, 6 N. Y., 397, 57 Am. Dec., 455; Leavitt v. Fiberloyd Co., 196 Mass., 440, 15 L. R. A., n. s. 855; Tomlinson v. Armour & Co., 75 N. J. L., 748, 19 L. R. A., n. s., 923; Watson v. Augusta Brewing Co., 124 Ga., 121, 1 L. R. A., n. s., 1178; Heindirk v. Louisville Elevator Co., 122 Ky., 675; Standard Oil Co. v. Tierney, 92 Ky., 367; Berger v. Standard Oil Co., 126 Ky., 155; Olds Motor Works v. Shaffer, 145 Ky., 616; Huset v. J. I. Case Tresh. Machine Co., 120 Fed. Rep., 865, 61 L. R. A., 303; Woodward v. Miller, 119 Ga., 618, 100 A. S. R., 188; Weiser v. Holzman, 33 Wash., 87, 99 A. S. R., 932.

But there is and should be a difference between the liability of the manufacturer and the liability of the dealer in this class of cases. The manufacturer should be and is held to a higher degree of care than the dealer in putting on the market dangerous compounds, because he knows or should be charged with notice of the quality and contents of the article that he manufactures; and being the originator of it, should be required to give notice of the danger in its use, if it is dangerous. But the dealer who buys from the manufacturer occupies practically the same position as does the purchaser from the dealer, and is not presumed to know the formula by which the article is made, or whether it is inherently dangerous or not and it is doubtless due to the limited liability of the dealer when he is not guilty of misrepresentation or fraud that so few cases can be found presenting the precise question here involved. A case in point is Clement v. Rommeck, 149 Mich., 595, 13 L. R. A., n. s., 382. There the action was brought by a third party against Crosby & Co., the manufacturer, and Rommeck, the merchant who sold the article, to recover damages for injuries sustained in the use of a stove polish. A

demurrer to the petition was sustained on behalf of the merchant, and in affirming this ruling the court said:

"It is manifest from a reading of this declaration that the theory fairly to be deduced from it is that, though the defendant Rommeck bought the preparation from Crosby & Co. properly labelled in the open market, and sold it in the open market, the positive duty rested upon him to know the property of the goods and their inflammable nature, and to communicate the facts to the purchaser. It is to be noted that the declaration contains no averment that the defendant Rommeck had actual knowledge of the inflammable nature of the goods; nor is it averred in what manner he was negligent in not knowing their inflammable nature. It gets down to this: Whether a dealer—a hardware merchant, for example—who buys in the open market stove polish which purports to be safe and proper for use, and sells the article for a purpose for which it is apparently intended, is liable, in the absence of negligence, if it turn out that the article is not adapted to the use, and causes injury. We think it clear, upon principle, that no such liability exists."

Another similar case is West v. Emanuel, 198 Pa., 180, 53 L. R. A., 330. There an action was brought against a retail druggist to recover damages for injuries sustained in the use of a headache powder. In holding the druggist not liable, the court said:

"The Kohler Headache Powders were in demand at least twelve or fifteen years ago, and from that time on they were to be found for sale in most, if not all, of the principal drug stores. They were recognized and regarded as an efficient and proper remedy for headaches, and were mainly used to relieve them. They were a patent or proprietary medicine manufactured by Kohler, and sold by him to the drug stores, which sold them to their customers. In the sales of patent or proprietary medicines furnished by the compounder of the ingredients which compose them the druggist is not required to analyze the contents of each bottle or package he receives. If he delivers to the customer the article called for with the label of the proprietary or patentee upon it, he can not be justly charged with negligence in so doing." See also White v. Oaks, 88 Maine, 367, 32 L. R. A., 593.

In our opinion the petition was defective and evidence was not sufficient to take the case to the jury.

The court should have sustained the motion for a peremptory instruction requested in behalf of appellant.

Wherefore the judgment is reversed for proceedings in conformity with this opinion.

The whole court sitting. Judge Winn dissenting in part.

OPINION BY JUDGE WINN—Dissenting in part from the opinion of the court.

I dissent from so much of the court's opinion herein as holds that the Christian Circuit Court had jurisdiction of this action. The cause of action arose upon a tort committed by the sale of an explosive substance without any notice or label of its dangerous nature. The evidence is conclusive that every act done by appellant in connection with this substance was done in Jefferson county, and there the appellant parted with all ownership of or control over it. The wrong it committed was in permitting the article to go out without brand. The failure to brand it was a failure in Jefferson county. No part of the tort, whether of commission or omission, was done in Christian county and, therefore, Section 72 did not give the Circuit Court of that county any jurisdiction of the action. The case of Mitchell v. Ripy, 82 Ky., 516, cited in the opinion herein as controlling, is not in point. That case arose under Section 74 of the Civil Code. It was in damages for false arrest. The arrest was made in Marion county, "the injury was done" there, and, of course, under the express provision of Section 74, the county where the injury was done was the county of the jurisdiction; while under Section 72, not the place where the injury is done, but the place where the wrong itself is committed, is the place of jurisdiction. In my judgment the court's opinion in the case at bar confuses the commission of the tort named in Section 72 with the injury suffered named in Section 74, as fixing the jurisdiction. The theory of a continuing wrong or of a continuous act will not bear analysis. It is not a case of a continuous action or motion as where, for instance, a man might stand in one county and fire a pistol, injuring one in another county. On the contrary, the sale of the unlabeled article was entire and complete in Jefferson county; and since the code makers said that the jurisdiction should be in the

county where the tort was committed it is not within our province to add to the code that the action can as well be brought in any county where any one may suffer injury.