## GREEN v. STANDARD WHOLESALE PHOSPHATE & ACID WORKS et al. BURTON'S ADM'R v. SAME. BURTON et al. v. SAME.

District Court, D. Maryland. December 21, 1928.

Glick & Schlossberg and George Forbes, all of Baltimore, Md., for libelant Green.

Henry L. Wortche, George Forbes, and Paul Berman, all of Baltimore, Md., for libelant administrator.

Mapp & Mapp, of Accomac, Va., and Miles & Edgett, George Forbes, Henry L. Wortche, and Paul Berman, all of Baltimore, Md., for libelants Burton.

Fendall Marbury, L. Wethered Barroll, Wm. L. Marbury, and Lord & Whip, all of Baltimore, Md., for respondents.

SOPER, District Judge. There are three cases before the court at this time: One case on behalf of John Edward Green against the Standard Wholesale Phosphate & Acid Works; one case on behalf of the estate of Lee Burton against the same defendant; and a third case on behalf of the parents of Lee Burton against the same defendant. Other defendants were joined in the pleadings, but we are concerned here now only with the liability of the Standard Wholesale Phosphate & Acid Works. These cases have been tied together obviously because the injuries suffered by Green and Burton were received at or about the same time.

There is no substantial issue of fact between the parties. We know that the Standard Company manufactured certain goods and then shipped them on board the Emperor of Halifax, and that on this occasion it also acted as stevedore employing the libelants, Green and Burton, to help put the goods aboard the ship.

We furthermore know that the men were injured in the course of that employment, and there is no real dispute as to the cause of the injury. We know that on February 9, 1927, one of the respondent's employés, a colored stevedore, named Williams, went down through No. 1 hatch into the hold and was overcome by carbon dioxide gas. It is conceded that this dangerous gas was in the hold of the ship and that Williams was overcome by it. Williams is not before the court, but it is perfectly clear that the case should be decided, so far as the liability of the respondent is concerned, as if it were the case of Williams. The two men who are actually before the court are men who were injured in an attempt to rescue Williams. One went down into the hold to tie a sling about the injured man so as to have him brought up, and when he failed to tie the rope properly, a second went down to help him. The injured man was safely brought up, but the two men who bravely went to his rescue were injured, and one of them, Burton, subsequently died of his injuries. Then we have the fact, of which we are all glad to make mention, that there was still a third brave man, Theodore Anderson, who went down at considerable

danger to himself and rescued the two men who had themselves gotten into danger by trying to rescue the first injured man.

There are only two points upon which there is any dispute as to the actions of the injured parties. The first is whether Green and Burton were ordered to go down into the hold to rescue Williams, or whether they went down voluntarily. It is not necessary to decide this issue of fact, because the liability of the respondent is the same in either case—if there is any responsibility at all. The court is inclined to think that these men were quite willing and ready to go and needed no orders; in other words, that they were volunteers. The second point of difference in the testimony is the method by which the two injured men attempted to leave the hold after they had successfully tied Williams to the sling. Green says that they endeavored to go up the ladder, and that Burton, who was first on the ladder, was overcome before he reached the top, fell, and in his fall carried Green to the bottom of the hold. Testimony of the defendant's witnesses is to the effect that they did not use the ladder, but got hold of the rope to which Williams had been attached and tried to come up with it when it was hauled up by the winch; but fell in the attempt. This would not be a particularly easy issue of fact to decide. But it is not necessary to decide it, and for the purposes of this case it may be assumed that the men came up as the defendant's witnesses described; because it would not be possible to say that there was any negligence on their part under the circumstances, if they came up that way. Williams had been overcome in a very few minutes, and it was common sense for his rescuers to get out as soon as they could, and it would be a harsh conclusion to require of them, in the excitement of the moment, the same deliberation and care as if they had had plenty of time. It would be a rather silly thing for a man to walk down a ladder from the second story of his house if he could go down the stairway, but nobody would say he was negligent in using a ladder if his house was on fire. It is safe to assume in this case that the respondent is right in both of these particulars, that the men went down voluntarily and not because of orders, and that they came up, or attempted to come up, by clinging to the rope.

Now it was said above that the liability of the Standard Company in these cases should be determined by answering the question: Would the Standard Company have been liable to Williams had he been injured?

Counsel do not seriously dispute this point, but agree that the principle laid down in the case of the Maryland Steel Co. v. Marney, 88 Md. 482, 42 A. 60, 42 L. R. A. 842, 71 Am. St. Rep. 441, is the true principle. That was a case in which a man was injured when, with reasonable care, he was seeking to save the life of another who was put in danger by the defendant's negligence. And the court held that although the plaintiff voluntarily left a position of safety and exposed himself to danger, he was not, under those circumstances, guilty of contributory negligence.

The same principle was followed in Dunagan v. Appalachian Power Co. (C. C. A.) 11 F.(2d) 65. So that it follows that neither Green nor Burton should be deprived of the right to recover simply because they voluntarily went into danger in this case.

Was it then the duty of the Standard Company to make certain that there was no dangerous gas in the hold of the ship? Did the company, in accordance with the well-understood rules of law, provide a safe place for these men to work, and would the company have been liable to Williams? It has been pointed out by counsel for the respondent that, under such circumstances, an employer is not an insurer. The rule has been stated in one place, among many, in the case of Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361, that while the employer is bound to provide a safe place in which the employé is to work, and that is a positive duty which may not be delegated to another, it is also true that there is no guaranty by the employer that the place shall be absolutely safe. "He is bound," said the court, "to take reasonable care and make reasonable effort, and the greater the risk which attends the work to be done and the machinery to be used, the more imperative is the obligation resting upon him." That general language has its importance here because the parties were dealing with something that was known to be highly dangerous, and it is obvious that any reasonably prudent man would take every precaution in such a case to protect his employés from harm. That does not mean, of course, that any higher degree of care should be exercised than reasonable care, for all will agree that any ordinarily prudent man, dealing with a substance which has fatal possibilities, will use the very highest degree of care to prevent loss of life.

The contention of the libelants is that the place in which the stevedore's employés were obliged to work was rendered unsafe by a dangerous gas emanating from the goods which the employer itself had manufactured and stowed under No. 2 hatch in the hold of the ship. The cases cited by them correctly set out the duty of a manufacturer when dealing with dangerous substances. See Peaslee-Gaulbert Co. v. McNath, 148 Ky. 265, 146 S. W. 770, 39 L. R. A. (N. S.) 465, Ann. Cas. 1913E, 392; Thornhill v. Carpenter-Morton Co., 220 Mass. 593, 108 N. E. 474; Adams v. Grand Rapids Refrigerator Co., 160 Mich. 590, 125 N. W. 724, 27 L. R. A. (N. S.) 953, 136 Am. St. Rep. 454, 19 Ann. Cas. 1152. The manufacturer who causes the component parts of an article to be put together must be presumed to know the nature and quality of the resultant compound. Proof of actual knowledge is not required where the article is so made up as to be inherently harmful, and he cannot excuse himself upon the ground that he did not know its dangerous qualities. He is responsible for injuries caused by his failure to foresee the results of the operation of natural laws, even though such results may be of an unusual character.

Now, how may we apply these general rules to the manufacture and stowage of the fertilizer in this case? The Standard Company, having treated phosphate rock with sulphuric acid, so as to produce acid phosphate, a substance well known in the manufacture of fertilizers, loaded the material into burlap bags. Previously each bag had been treated with a small amount of hydrate of lime, said to range in quantity from a quarter pound to four pounds. The lime was blown into the bag so as to protect the bagging and the stitching from the effect of the acid; in other words, to make the package more secure. No unusual or unfamiliar substances were employed. The respondent itself has offered testimony tending to show that the lime was such as is customarily employed, and that the acid phosphate, containing 16 per cent. of available phosphoric acid, was of a character well known to the trade. Now the testimony of the chemist offered by the libelants is undisputed that when acid phosphate, containing free phosphoric acid, as did the contents of the bags in this case, comes into contact with hydrate of lime, carbon dioxide is liberated; and this reaction is but the operation of a natural law well known to persons skilled in the science of chemistry. Carbon dioxide gas becomes dangerous to human beings when it forms as much as 1 per cent. of the air by volume, and is usually fatal when the percentage rises to 7 or 8 per cent. The court is therefore obliged to find that the

respondent did bring together substances which it knew, or ought to have known, would produce a gas dangerous to human life.

The respondent admits that the accidents were brought about by the presence of carbon dioxide in the hold of the ship, but the chemist produced by it as an expert has expressed the opinion that the quantity of lime used in the protection of the bags was insufficient to produce the amount of gas which was found. 15,036 bags, containing 1,253 tons of acid phosphate, were stowed in the forward hold of the ship so as to reach from the ceiling of the ship to within 3 feet of No. 2 hatch. There was no bulkhead or division in the forward hold between No. 1 and No. 2 hatch, but no cargo had been loaded into No. 1 hatch when Williams entered it in the early morning of February 9, 1927. He was overcome when he reached the bottom of the hold. The cargo in No. 2 hatch had been stowed on February 8th and the early morning of February 9th, and the covers had been in place on both hatches for some hours before the accident. The opinion of respondent's chemist was based in part upon the practice pursued without injury, in small fertilizer mixing plants in country districts, under which it is customary to mix with acid phosphate a much larger proportion of carbonate of lime than was present in the hydrate of lime in the instant case. The conditions in these small mixing plants, however, are not similar to those under which the fertilizer was stowed in the hold of the Emperor of Halifax. Carbon dioxide is 1½ times heavier than air, and consequently an opportunity was afforded for the collection of the gas at the bottom of the hold of the ship alongside the large pile of bags which reached up nearly to the main deck of the ship.

But it is not necessary to speculate as to the origin of the gas in this case. It is admitted that the substances used, when brought in contact, will produce it. It is conclusively proved that the gas was not present in the hold of the ship before the acid phosphate was stowed therein by the fact that the workmen were present in the hold during the previous day and night. It would have been impossible for them to have worked in the bottom of the hold without injury, had the gas then been present. There is no escape from the conclusion that it was formed in the manner which the libelants claim.

The respondent nevertheless contends that it should be discharged from liability in this case because the use of lime for the preservation of bags containing acid phosphate is well known and has been practiced in Balti-

more for many years without injurious results. It is said that the respondent should not be held liable for results which it could not reasonably have foreseen. Reliance is placed upon such cases as Pinkley v. Chicago & Eastern Illinois R. Co., 246 Ill. 370, 92 N. E. 896, 35 L. R. A. (N. S.) 679; Joyce v. Flanigan, 111 Md. 497, 74 A. 818. In the first case an employé was injured in handling timber that had been treated with creosote. It was known to employer and employé alike that there was some risk of blistering the skin in such an operation; but the plaintiff was the first person to sustain serious and permanent injury. No one knew that such a result was likely to happen, and the defendant was released from liability. In the second case a workman was suffocated by carbon dioxide gas when digging a trench in made ground, a result probably caused by the presence of decaying animal or vegetable matter; but it was shown that the employer had no reason to suspect the presence of the gas and he was held not to be liable in damages. These cases, however, should be distinguished from the case at bar, because in the latter the employer was chargeable with knowledge that a destructive gas was produced in the operation of packing the goods and stowing the cargo on ship. Both the production of the gas and its dangerous qualities were or should have been known to the respondent.

Nevertheless the respondent contends that it should be relieved from liability because it has conducted its business in the same manner as careful men in the same line have been wont to do without injurious result for a long period of time. In the manner in which the point has been pressed upon the court, it is tantamount to the contention that a custom of trade, unattended by injurious results, is a complete defense to a claim for damages. Such, however, is not the rule. The law on the subject of custom was considered in the case of The Charles Rohde (D. C.) 8 F. (2d) 506, in which the usage of a particular trade in the stowage of cargo on vessels was considered. The case of The Lake Fontanet (C. C. A.) 288 F. 544, was cited, wherein it was held that if, under the circumstances, the manner of stowage was faulty and negligent, the existence of a custom so to do was not a good excuse. In Texas & P. R. Co. v. Behymer, 189 U. S. 468, 470, 23 S. Ct. 622, 47 L. Ed. 905, the court said that what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not. It is the opinion of the court in the case at bar that the custom which has

been proved does not protect the respondent. Bearing in mind that it was engaged in the manufacture and packing for shipment of a substance, in the handling of which a dangerous gas was produced, it was obliged to inform itself as to how the gas would act under the conditions with which persons coming in contact with the goods would likely be confronted. So far as the evidence discloses, no effort was made by the respondent or any one else in the business to ascertain the quantity of gas produced under this or any other circumstances, or what became of it when goods were stowed in the hold of the ship. It was negligent even though it was customary for the respondent to fail to perform this duty.

The respondent was permitted in this case, over the objection of the libelants, to offer evidence of the customary use of lime in bags containing acid phosphate in the trade, although it was not shown that the conditions under which the goods were stowed on board ship were precisely similar to those in the case at bar. There was substance in the objection, but the evidence was admitted in order to shed all the light possible on the causes contributing to the accident. But it is important to bear in mind, when we endeavor to account for the unfortunate results in this case, that it has not been shown that on any prior occasion a large quantity of acid phosphate contained in bags treated with lime were stowed in a portion of the hold of a ship with the hatches down for an appreciable period. There is testimony tending to show that it is more usual in loading a hold of this character to use both hatches simultaneously so that the cargo is evenly distributed. Undoubtedly the depth of the gas at the bottom of the forward part of the hold was increased by the fact that the cargo almost completely blocked out one of the hatches, while under the other hatch there was no cargo at all. Whatever may be the explanation for the safety with which the same substances have been used during the preceding years, it has sufficiently been proved in this case that the gas was produced in the manner indicated, and that the manufacturer should have known that the methods employed would be attended by danger to persons handling the goods.

In the case of the estate of Lee Burton, the court will sign a decree for the sum of $1,000. In the case of his parents, a decree for $3,500—$2,000 payable to the mother and $1,500 to the father—will be signed. In the case of Green, a decree in the sum of $3,000 will be signed.